

FILED

Nov 30 2016, 7:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR
APPELLANTS/APPELLEES[1]
HANNUM WAGLE & CLINE
ENGINEERING, INC., D/B/A HWC
ENGINEERING, INC., MARLIN A.
KNOWLES, JR., JONATHAN A. DAY,
AND DAVID LANCET

David L. Swider
Andrew M. McNeil
Philip R. Zimmerly
Bose McKinney & Evans, LLP
Indianapolis, Indiana

ATTORNEYS FOR
APPELLEE/APPELLANT
AMERICAN CONSULTING, INC.,
D/B/A AMERICAN
STRUCTUREPOINT, INC.

Michael A. Wukmer
David M. Mattingly
Mark R. Alson
Audrey K. Hagedorn
Robert A. Jorczak
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

---

[1] Each party is designated as both appellant and appellee because, after Appellant Hannum Wagle & Cline Engineering, Inc., d/b/a HWC Engineering, Inc., Marlin A. Knowles, Jr., Jonathan A. Day, and David Lancet filed their appeal, Case No. 49A05-1601-PL-33 ("Case No. 33"), Appellee American Consulting, Inc., d/b/a American Structurepoint, Inc. ("ASI") filed a separate appeal against Hannum Wagle & Cline Engineering, Inc., d/b/a HWC Engineering, Inc., Marlin A. Knowles, Jr., Jonathan A. Day, and David Lancet. ASI's appeal was assigned appellate case number 49A04-1606-PL-1198 ("Case No. 1198"). However, because we found that the parties and subject matter of the two appeals were related, we consolidated Case No. 1198 with earlier-filed Case No. 33.

| Hannum Wagle & Cline Engineering, Inc., d/b/a HWC Engineering, Inc., Marlin A. Knowles, Jr., Jonathan A. Day, Tom Mobley,[2] and David Lancet, | November 30, 2016 |
|---|---|
| | Court of Appeals Case No. 49A05-1601-PL-33 |
| *Appellants/Appellees-Defendants,* | Appeal from the Marion Superior Court |
| v. | The Honorable Heather A. Welch, Special Judge |
| American Consulting, Inc., d/b/a American Structurepoint, Inc., | Trial Court Cause No. 49D01-1503-PL-7463 |
| *Appellee/Appellant-Plaintiff.* | |

**Kirsch, Judge.**

[1] Civil engineering firm American Consulting, Inc., d/b/a American Structurepoint, Inc. ("ASI") filed a lawsuit for, among other things, breach of contract, against its competitor Hannum Wagle & Cline Engineering, Inc., d/b/a HWC Engineering, Inc. ("HWC") and four of ASI's former employees, namely Marlin A. Knowles, Jr. ("Knowles"), Jonathan A. Day ("Day"), David Lancet ("Lancet") (together, "the Defendants"), and Tom Mobley ("Mobley"), after Knowles, and later Day, Mobley, and Lancet, left ASI's employment and began employment with HWC. The trial court issued amended findings of fact

---

[2] Tom Mobley is not a party to this appeal, but we include him in the caption because all parties of record in the trial court are parties on appeal. Ind. Appellate Rule 17(A).

and conclusions thereon that granted a preliminary injunction in favor of ASI against HWC, Knowles, Day, and Lancet[3] pursuant to non-compete and non-solicitation agreements that Knowles, Day, and Lancet each had executed with ASI. Defendants appeal the injunction and raise the following restated and consolidated issues:

> I. Whether the trial court abused its discretion when it entered a preliminary injunction enforcing non-competition restrictions contained within Knowles's employment agreement with ASI; and

> II. Whether the trial court abused its discretion when it entered a preliminary injunction enforcing non-solicitation restrictions contained within the Knowles, Day, and Lancet employment agreements.

[2] Several months after issuing the injunction, the trial court granted Knowles's motion to partially dissolve the preliminary injunction as to Knowles. ASI appeals that decision and raises two issues that we consolidate and restate as:

> III. Whether the trial court abused its discretion when it granted Knowles's motion and dissolved the injunction as it pertained to him.

[3] We affirm.[4]

---

[3] The trial court denied injunctive relief as to Mobley, and ASI does not appeal that decision.

[4] We held oral argument on October 21, 2016 at Purdue University's Krannert School of Executive Management. We thank counsel for their preparation and argument, and we commend them on their

# Facts and Procedural History[5]

## *The Parties*

[4]    ASI and HWC are civil engineering, architecture, planning and design firms in Indiana.  ASI's and HWC's clients include public bodies, such as municipal governments and entities in Indiana, including Indiana Department of Transportation ("INDOT"), Hamilton County, Hancock County, Boone County, Indianapolis, Carmel, and Franklin.[6]  Public bodies typically award their engineering and transportation projects through a qualification-based selection ("QBS") system designed to allow them to select engineers and professional consultants for projects based on qualifications rather than price. After the public entity selects the engineering firm, the parties then negotiate the project's fee, the project's scope, and other contract terms.

[5]    Knowles is a former employee and former owner of ASI.  Knowles began his employment with ASI in 1994 as an hourly construction inspector, working his way up the ranks in the company, and in 2004 or 2005, Knowles was promoted to Vice President of Sales Administration.  Knowles held this position until he resigned from ASI in May 2014.  Among other responsibilities, Knowles was

---

outstanding advocacy.  We also thank the students for their insightful questions and comments posed after, but not specifically related to, the oral argument.

[5] With few exceptions not relevant to the determination of this appeal, Defendants do not appear to challenge the trial court's findings of fact as being improper or unsupported by the evidence.

[6] As public entities do not exclusively contract with any company for engineering services, ASI and HWC have as clients some of the same entities.

responsible for overseeing ASI's sales and was actively involved in the sales process, including "making the pitch" for clients to select ASI in the QBS process. *HWC Appellants' App*. at 30.[7]  As part of his sales duties, Knowles was involved in building business relationships and goodwill on behalf of ASI. Knowles was the assigned "principal in charge" for many ASI clients, including Cicero, Delaware County, Fishers, Grant County, Greendale, Hamilton County, Hancock County, INDOT, LaGrange County, Lawrenceburg, Morgan County, Noblesville, Orange County, and Putnam County. *Id*. at 17, 71.  To help obtain business for ASI and to build relationships with clients, Knowles attended business development activities, such as breakfasts, lunches, dinners, charitable functions, golf outings, trips, sporting events, industry conferences, networking events, receptions, and political functions.  ASI paid for his attendance at these activities.

[6]  In 2008, Knowles was offered and accepted ownership in ASI.  On December 29, 2008, Knowles and ASI entered into an Employment, Non-Disclosure and Non-Competition Agreement ("the Knowles Agreement"), which contained non-competition and non-solicitation restrictive covenants, whereby Knowles agreed to not do the following, directly or indirectly:

> (1) sell, provide, attempt to sell or provide, or assist any person or entity in the sale or provision of, any Competing

---

[7] We will refer to the appendix filed by Defendants in their appeal as *HWC Appellants' App*.

Products/Services to any of the Company's Customers or Active Prospects;

(2) solicit or communicate with any such customers for the purpose of selling, providing, attempting to sell or provide, or assisting any person or entity in the sale or provision of, any Competing Products/Services; and

(3) solicit, recruit, hire, employ, attempt to hire or employ, or assist any person or entity in the recruitment or hiring of any person who is an employee of ASI, or otherwise urge, induce or seek to induce any person to terminate his/her employment with ASI.

*Id*. at 135-37; *Joint Ex*. 235.

[7]    Like Knowles, Day and Lancet formerly worked at ASI. Each worked as a resident project representative. On Day's first day of employment at ASI, January 3, 2005, he signed a "Terms and Conditions of Employment" agreement with ASI ("the Day Agreement"), which included terms restricting him from soliciting or recruiting his former coworkers. *Joint Ex*. 8; *HWC Appellants' App*. at 23. Lancet began working for ASI in 1998; later, in January 2007, Lancet signed a "Terms and Conditions of Employment" agreement with ASI ("the Lancet Agreement"), which contained a non-solicitation provision identical to the one in the Day Agreement. *Joint Ex*. 234; *HWC Appellants' App*. at 24.

[8]    Eventually, Knowles became unhappy at ASI, and in the winter of 2013 and spring of 2014, he met with the President of HWC, Ed Jolliffe ("Jolliffe"), and

its Vice President, Terry Baker ("Baker"). At that time, HWC desired to make improvements to its transportation department, and it was familiar with Knowles because of his experience and reputation in the industry. Knowles told Jolliffe and Baker that he had an employment agreement with ASI and that he intended to abide by his contract. Jolliffe and Baker advised Knowles that HWC would position Knowles in an operations role at HWC to comply with the restrictive covenants in the Knowles Agreement.

[9] On May 5, 2014, Knowles submitted a resignation letter to ASI, and in it, he stated that he would comply with the Knowles Agreement. *Joint Ex*. 90; *HWC Appellants' App*. at 26. The letter did not mention that Knowles was joining HWC as its Vice President of Operations. On May 7, ASI's President Rick Conner circulated an announcement to ASI employees that Knowles had resigned. Knowles's last day at ASI was May 14, 2014. On May 19, 2014, HWC issued a press release announcing Knowles had joined HWC, and it circulated the press release to, among others, people and entities Knowles had identified on a list of "Key Clients." *Joint Exs*. 44, 48, 52; *HWC Appellants' App*. at 84.

[10] As HWC's Vice President of Operations, Knowles headed up four divisions, including HWC's transportation division. After starting at HWC, Knowles began performing what HWC describes as contract-based activity, which included reviewing fees and verbiage in contracts and tracking down signatures for contracts. Knowles also continued to interact with HWC contacts who were also clients or prospective clients of ASI. Such interactions included going

on fishing trips, playing poker, golfing, attending political and not-for-profit fundraisers, and seeing these friends and colleagues at various events and sharing family updates with them. At that time, the head of HWC's transportation division was Randy Hancock ("Hancock"), and Hancock reported directly to Knowles. Hancock was not provided a copy of the Knowles Agreement and was not told what Knowles's restrictions were, such as what clients were off-limits to Knowles. Jolliffe never read the Knowles Agreement and never had a complete list of Knowles's clients at ASI.

[11] In the months that followed Knowles's May 2014 departure from ASI, a number of other ASI employees also left ASI and went to work for HWC. Initially, two days after HWC's May 19 press release about Knowles joining HWC, ASI project-manager Clint Sparks ("Sparks") sent an email, from his home account, to Knowles, indicating that he was planning to submit a resume to HWC and that "my story will be I am retiring and building a home in southern Indiana[.]" *Joint Ex*. 92; *HWC Appellants' App*. at 45. Sparks noted "This is sent from my home email so we ought to be OK" and "Cell and this email should be safe for both of us[.]" *Joint Ex*. 92. On June 12, 2014, Sparks submitted his resume to HWC. Jolliffe and Hancock discussed Sparks's qualifications with Knowles, and on July 13, HWC made a written offer to Sparks, which he accepted on July 17, 2014. Sparks thereafter resigned from ASI and told ASI that he was retiring; Sparks began working at HWC on August 11, 2014.

[12] Also shortly after Knowles left, Day visited HWC's website, saw job openings for construction inspectors and, on June 24, 2014, submitted a resume to HWC. That same day, Knowles met with Lancet at a restaurant. Thereafter, Joliffe contacted and interviewed Lancet, telling Lancet that, in the spring of 2015, HWC would have positions to fill for resident project representatives and construction inspectors. On August 11, 2014, Lancet submitted a resume to HWC.

[13] In August 2014, Day resigned from ASI and joined HWC. ASI did not remind Day at his exit interview that he had signed the Day Agreement, and Day testified that when he left ASI and joined HWC, he did not remember that he had signed the Day Agreement and was unaware that he was subject to a non-solicitation agreement. *HWC Appellants' App.* at 49; *Tr.* at 770, 781. Shortly after joining HWC, Day prepared a list of various employees at ASI that he thought may be interested in joining HWC, which he called "HWC Potential Employees." *Joint Ex.* 9; *HWC Appellants' App.* at 56, 58. Day sent the list to Knowles in September 2014. The Potential Employees list identified ten potential employees, nine of whom were then-current ASI employees. Day called various employees at ASI to gauge their interest in joining HWC and forwarded their applications to HWC's management. Day had some discussions with Knowles about ASI employees who might be interested in joining HWC.

[14] In or around this same time, Sparks, who was then employed at HWC, contacted Lancet, who was still at ASI, about HWC's design engineering needs and requested names of anybody at ASI who was unhappy or that would be a

potential candidate for HWC. In August or September 2014, and in response to Sparks's inquiry, Lancet provided Sparks with the names of several ASI employees, including Amber Tolle ("Tolle"). Sparks stated to Lancet in a September 10, 2014 text message, "Keep hitting delete because if the sharks smell blood - who knows!" *Joint Ex*. 112; *HWC Appellants' App.* at 53.

[15] In September, Tolle submitted a resume to HWC. On September 28, Sparks wrote an email to Knowles and Hancock about the fact that Tolle had submitted a resume to HWC, but Sparks inadvertently sent the email to Knowles's old ASI email address, which ASI was monitoring in order to respond to clients. ASI thus learned of Sparks's and Knowles's involvement in Tolle's application to HWC.

[16] In late October 2014, Knowles created a document that he saved as "Recruiting List," which listed eleven potential recruits for HWC's transportation division, eight of whom were ASI employees. *Joint Ex*. 98; *HWC Appellants' App.* at 59-60. Later, on November 13, 2014, Knowles, Day, and Hancock met and discussed HWC's potential candidates and upcoming needs, using a handwritten list that Knowles had made. *Joint Ex*. 17. The handwritten list contained a list of fifteen "Candidates," eleven of whom were then-ASI employees. *Id*. In November, Knowles emailed the handwritten list to Hancock and Day.

[17] In late November and December, several other ASI employees, some of whom met with Day at Day's home, submitted their respective resumes to HWC,

including Mobley. After receiving a job offer from HWC, Mobley discussed HWC employment with ASI employee Tim Conarroe ("Conarroe"), telling him that he should submit a resume, but not to do so on an ASI computer. Conarroe was not interested, and he reported Mobley's conversation to ASI management.

[18] Having received reports and other evidence concerning recruitment of its employees by HWC, ASI began an internal investigation in early 2015 consisting, at least in part, of conducting interviews with ASI employees and meetings with ASI attorneys. ASI discovered that HWC had made offers of employment to six of its construction inspectors, including Lancet, Mobley, and Tolle. In February 2015, Lancet and Mobley each received and accepted a verbal offer of employment from HWC, and on March 6, 2015, ASI terminated Lancet and Mobley. In March 2015, several other employees, including Tolle, accepted HWC's offer of employment and resigned from ASI.

## Procedural History

[19] On March 6, 2015, ASI filed a verified complaint for injunctive relief and damages, alleging claims against HWC, Knowles, Day, Lancet, and Mobley for breach of contract, breach of the fiduciary duty of loyalty, unfair competition, civil conspiracy, tortious interference with contract and business relationships, and unjust enrichment. *HWC Appellants' App.* at 109-59. Following some extensions of time for the parties to conduct discovery, ASI moved on July 2, 2015 for a preliminary injunction to enjoin Defendants from directly or indirectly communicating with or serving ASI's former, current, or prospective

customers in violation of the Knowles Agreement, and to prohibit Defendants from directly or indirectly communicating with, soliciting, or recruiting ASI employees in violation of the Knowles, Day, and Lancet Agreements. *Id*. at 176-78. A three-day evidentiary hearing was held on September 29, 30, and October 1, 2015, at which evidence was submitted and witnesses testified.[8] The parties thereafter submitted proposed Findings of Fact and Conclusions of Law.

[20] On December 11, 2015, the trial court issued Findings of Facts, Conclusions of Law, and Order Granting in Part the Plaintiff's Motion for Preliminary Injunction against HWC, Knowles, Day, and Lancet.[9] *Id*. at 12-100. The trial court denied ASI's request for an injunction against Mobley.[10]

[21] With regard to the non-compete provisions of the Knowles Agreement, the trial court found: (1) ASI has a legitimate and protectable interest in its customers, in the "good will" that Knowles was hired to generate between ASI and its customers, and in its "need to start again on building personal relationships" after Knowles left ASI; (2) these interests may be protected by the non-compete provisions of the Knowles Agreement, which was enforceable because it was narrowly tailored and reasonable with respect to time, activity, and geography; and (3) ASI established a reasonable likelihood of success of proving Knowles

---

[8] ASI indicates that "[s]eventeen witnesses testified . . . and over 160 exhibits were admitted." *ASI Appellee's Br.* at 3. Admitted evidence included deposition designations, documents, affidavits, and live testimony.

[9] The trial court's extensive and thorough Findings and Conclusions, 89 pages in length, aided our appellate review.

[10] Mobley did not have an employment agreement with ASI.

breached the non-compete provisions of the Knowles Agreement. *HWC Appellants' App.* at 67-99. The trial court also held that ASI established a reasonable likelihood of success of proving at trial that Knowles, Day, and Lancet breached the non-solicitation provisions contained in their respective Agreements. *Id.* With regard to HWC, the trial court determined that ASI had established a reasonable likelihood of success of proving at trial that "HWC worked with Knowles to violate his [noncompetition] agreement" and that "HWC[] and Knowles intentionally worked together to hire multiple ASI employees."[11] *Id.* at 90-91.

[22] Defendants filed a motion to modify and clarify the injunction order, seeking clarification of the scope of the operations duties that Knowles could or could not perform at HWC, and the trial court, following a hearing, issued, on January 25, 2016, Amended Findings of Fact, Conclusions of Law, and Order ("Amended Order"). The Amended Order incorporated the trial court's December 2015 Findings and Conclusions and clarified that Knowles could continue to serve in an operations role at HWC.[12] However, Knowles was preliminarily enjoined from (1) directly or indirectly selling, providing, attempting to sell or provide, or assisting any person or entity in the sale or

---

[11] HWC notes that the injunction prohibits Knowles, Day, and Lancet from "acting in concert or conspiracy with" any other person or entity, including but not limited to HWC "to commit the acts prohibited" by the injunction, and, therefore, HWC's position "is really derivative of the limitations imposed on Knowles, Day, and Lancet." *HWC Appellants' Br.* at 3 n.1.

[12] The Amended Order included a non-exhaustive list of operations functions to illustrate the types of tasks that Knowles could perform that would not violate the non-compete. *HWC Appellants' App.* at 105-06.

provision of, any Competing Products/Services to any of the Company's Customers or Company's Active Prospects;[13] (2) soliciting or communicating with any such customers for the purpose of selling, providing, attempting to sell or provide, or assisting any person or entity in the sale or provision of, any Competing Products/Services; and (3) soliciting, recruiting, hiring, employing, attempting to hire or employ, or assisting any person or entity in the recruitment or hiring of any person who is an employee of ASI, or otherwise urging, inducing or seeking to induce any person to terminate his/her employment with ASI. *HWC Appellants' App.* at 101-08.

[23] With regard to Day and Lancet, the Amended Order preliminarily enjoined them from soliciting or endeavoring to entice away, knowingly offering employment to, knowingly employing, or offering or concluding any contract for services with any person who was employed by ASI as of the date that Day's and Lancet's employment with ASI ceased. *Id*. The Amended Order also prohibited Knowles, Day, and Lancet from acting in concert or conspiracy with any other person, including but not limited to HWC, to commit any acts prohibited by the Amended Order. *Id*.

[24] In April 2016, Knowles filed a motion asking the trial court to partially dissolve the preliminary injunction on May 14, 2016, arguing that the 24-month

---

[13] The terms "Competing Products/Services," "Company's Customer" and "Active Prospects" are not in dispute and are defined in the Knowles Agreement and the trial court's Amended Order. *HWC App*. at 103-04, 135-36.

restriction in the Knowles Agreement began to run on May 14, 2014 and would expire on May 14, 2016. ASI responded that the express terms of the Knowles Agreement provided for an extension and also asserted that the doctrine of equitable estoppel should apply to prevent Knowles's attempt to dissolve the injunction because Knowles should not benefit from his violation of the restrictions. The trial court held a hearing on May 16, 2016, and on May 20, 2016, it granted the motion and dissolved the injunction as to Knowles and his non-compete, finding that (1) Indiana law precluded the enforcement of agreements to extend the duration of non-compete provisions when a preliminary injunction had been entered, and (2) ASI failed to satisfy the elements of equitable estoppel.[14] Thereafter, ASI filed its appeal, which this court consolidated with Defendants' earlier-filed appeal.

# Discussion and Decision

## Standard of Review

In order to obtain a preliminary injunction, ASI had the burden of demonstrating by a preponderance of the evidence: (1) a reasonable likelihood of success on the merits at trial; (2) the remedies at law are inadequate and that

---

[14] Defendants note that, although the injunction enjoining Knowles has been dissolved, as of May 2016, Knowles's appeal is not moot because the merits of his claims -- that the trial court improperly interpreted the Knowles Agreement and relied on speculative harm to support an injunction -- are matters of public interest and capable of repetition, and further, to the extent that a trial is held in this matter, a correct interpretation of the Knowles Agreement is critical for the preparation of jury instructions. *HWC Reply Br.* at 6 n.1. Moreover, Defendants observe, ASI is appealing the order dissolving the injunction. *Id.* We agree and proceed to address the issues raised by both parties on their merits.

irreparable harm will occur during the pendency of the action; (3) the threatened injury to ASI outweighs the potential harm to HWC, Knowles, Day, and Lancet from the granting of an injunction; and (4) the public interest would not be disserved by granting the injunction. *Cent. Ind. Podiatry, RC. v. Krueger*, 882 N.E.2d 723, 727 (Ind. 2008); *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 172 (Ind. Ct. App. 2008).

[26] To establish a party has a reasonable likelihood of success on the merits, the party must establish a prima facie case. *Apple Glen Crossing, LLC v. Trademark Retail, Inc.*, 784 N.E.2d 484, 487 (Ind. 2003); *Pinnacle Healthcare, LLC v. Sheets*, 17 N.E.3d 947, 953 (Ind. Ct. App. 2014). "The party is not required to show that he is entitled to relief as a matter of law, nor is he required to prove and plead a case, which would entitle him to relief upon the merits." *Avemco Ins. Co. v. State ex rel. McCarty*, 812 N.E.2d 108, 118 (Ind. Ct. App. 2004).

[27] "The grant or denial of a preliminary injunction is within the sound discretion of the trial court, and the scope of appellate review is limited to deciding whether there has been a clear abuse of discretion." *Gleeson*, 883 N.E.2d at 171-72. When considering whether a trial court's grant of a party's motion for a preliminary injunction constitutes an abuse of discretion, this court determines whether the evidence supports the trial court's special findings of fact and whether the findings support the judgment. *Clark's Sales & Serv., Inc. v. Smith*, 4 N.E.3d 772, 780 (Ind. Ct. App. 2014), *trans. denied*. This court should not disturb the findings or judgment unless they are clearly erroneous, nor should the court reweigh the evidence or reassess witness credibility. *Id*. Rather, the

court should consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Id*. We will reverse the trial court's judgment only when it is clearly erroneous, and a judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Gleeson*, 883 N.E.2d at 172.

# I. Knowles's Non-Compete Agreement

[28] There is no dispute that Knowles validly executed the Knowles Agreement, Section 9(a) of which contained the following non-competition covenants:

> During the Restricted Time Period, **Employee will not sell, provide, attempt to sell or provide, or assist any person or entity in the sale or provision of, any Competing Products/Services to any of the Company's Customers**[15] with respect to whom at any time during the twenty-four (24) months immediately preceding the termination of Employee's employment with the Company, Employee had any sales or

---

[15] The Agreement defined "Company's Customers" as "any person or entity to whom Company sold or provided any products and/or services at any time during the twenty-four (24) months immediately preceding the termination of Employee's employment with the Company." *HWC Appellants' App.* at 136. Section 9(d) of the Knowles Agreement extended the prohibitions of Section 9(a) to encompass the "Company's Active Prospects," defined as:

> (i) any person or entity that Employee, on behalf of the Company, solicited, assisted in the solicitation of, or engaged in marketing or sales towards, at any time during the twelve (12) months immediately preceding the termination of Employee's employment with the Company; and/or (ii) any person or entity to whom the Company submitted a proposal or quote for the sale or provision of the Company's products/services at any time during the twelve (12) months immediately preceding the termination of Employee's employment with the Company.

*Id.*

service contact on behalf of the Company, Employee had any business contact on behalf of the Company, Employee had any sales or service responsibility (including without limitation any supervisory or managerial responsibility) on behalf of the Company, Employee had any project responsibility on behalf of the Company, or Employee had access to, or gained knowledge of, any Confidential Information concerning the Company's business with such customer, **or otherwise solicit or communicate with any such customers for the purpose of selling, providing, attempting to sell or provide, or assisting any person or entity in the sale or provision of, any Competing Products/Services**. . . .

"Restricted Time Period" means the period of Employee's employment with the Company and for twenty-four (24) months immediately after the termination of Employee's employment with the Company regardless the reason for such termination.

*Joint Ex*. 235 (emphasis and paragraph separation added); *HWC Appellants' App.* at 135-36. Section 9(h) prohibited Knowles from violating the covenants directly or indirectly:

Employee acknowledges and agrees that the covenants contained in this Section 9 prohibit Employee from engaging in certain activities **directly or indirectly** whether on Employee's own behalf or on the behalf of any other person or entity, and regardless [of] the capacity in which Employee is acting, including without limitation as an employee, independent contractor or owner.

*Id*. (emphasis added). In the Knowles Agreement, Knowles agreed that the restrictions imposed were reasonable and necessary for the protection of ASI's

legitimate interests, including business relationships and goodwill, and would not post any substantial hardship on him.[16]  *Id*. at § 12.

[29]  In its Findings and Conclusions issuing the injunction on Knowles's non-compete, the trial court addressed the four-part test for a preliminary injunction and determined:  (1) ASI established a reasonable likelihood of success on the merits of its breach of contract count against Knowles, Day, and Lancet; (2) ASI's remedies at law are inadequate and that ASI established irreparable harm, noting that "the irreparable harm requirement 'does not mandate that the party demonstrate specific losses in its business'" and that the evidence showed that, as a result of Knowles's violation, there could be harm in the future to ASI, including loss of goodwill and a need to rebuild relationships and trust; (3) the threatened injury to ASI outweighed the potential harm to HWC, stating, "The threatened injury to ASI is great," such as an erosion of ASI's "pipeline of business," while the potential harm to Defendants is "not large," noting Defendants did not present evidence to show any harm "if the court enforces the agreements prior to trial[;]" and (4) it would not disserve the public interest to enforce the non-competition (and non-solicitation) provisions, observing that ASI's requested injunctive relief would not prevent HWC from competing with

---

[16] Knowles also agreed that a breach or threatened breach of Section 9 would give rise to irreparable injury to ASI, that money damages would not be adequate relief for such injury, and that ASI shall be entitled to obtain equitable relief and injunctive relief, including a preliminary injunction.  *HWC Appellants' App.* at 138 (§ 11(a)).  Although the Knowles Agreement contained a liquidated damages provision, *id*. at 138-39, the parties advised at oral argument that the trial court had determined that the liquidated damages provision constituted a penalty and was unenforceable.

ASI, "just as it had prior to Knowles joining it." *HWC Appellants' App.* at 67-97 (Conclusion Nos. 4, 100, 102, 105, 109, 111, 113, 115, 117).

### A. Irreparable Harm

In challenging the trial court's entry of the injunction, Defendants initially assert that ASI did not make a showing of irreparable harm and did not show that its remedies at law were inadequate. They argue, "There is no evidence of actual harm from Knowles['s] actions while employed at HWC with respect to ASI clients. . . . No witness could identify any lost business or any specific projects that ASI was at risk of losing." *HWC Appellants' Br*. at 6. Defendants maintain that, at best, ASI was able to point only to possible lost work in the future due to Knowles's interactions with friends and business contacts, which is too speculative and not sufficient to meet the standard for showing a threat of imminent harm required for a preliminary injunction, and, accordingly, entry of a preliminary injunction was an abuse of discretion.

However, to obtain a preliminary injunction, our courts have recognized that "irreparable harm is that harm which cannot be compensated for through damages upon resolution of the underlying action." *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 912 (Ind. 2011). The irreparable harm requirement "does not mandate that the party demonstrate specific losses in its business." *AGS Capital Corp., Inc. v. Prod. Action Int'l, LLC*, 884 N.E.2d 294, 312 (Ind. Ct. App. 2008), *trans. denied*. In this case, ASI presented evidence that Knowles, while at HWC, was engaged in substantive work with individuals and entities that were ASI clients – work that HWC characterized as operations and contract-type work, not

sales – and he participated in client development activities with individuals and entities that were ASI clients. *HWC Appellants' App.* at 33-35, 39-42. ASI President Conner described Knowles's activities at HWC as "diverting" the "pipeline" of business opportunities. *Id*. at 35-36; *Tr*. at 31. The trial court determined that harm, whether current or future, to ASI's business, goodwill, and the trust and personal relationships developed with accounts and entities was "necessarily intangible[,]" but "the fact that it cannot be quantified in a dollar amount is an argument in favor of equitable relief[.]" *HWC Appellants' App.* at 92. We cannot say that the trial court's decision, finding that Knowles's actions damaged ASI's goodwill and posed a present and imminent threat to future business, was an abuse of discretion.

## B. Prohibited Conduct

[32] Defendants next argue that the trial court failed to strictly interpret the Knowles Agreement, in particular the restricted activity.[17] Defendants assert that "the restriction on selling competing services must be tied to specific projects or sales pursuits," but instead the trial court "expansively" determined the non-compete language to preclude him from "communicat[ing] with ASI clients . . . for the

---

[17] With regard to the restriction on "activity," Defendants note that Knowles's job, while at ASI, "was to administer the sales process," and he did not perform engineering services for ASI, and because he did not do so, any restriction on his ability to provide such services to HWC's clients cannot be enforceable under Indiana law. *HWC Reply Br*. at 7 n.2 (citing *Cent. Ind. Podiatry, RC. v. Krueger*, 882 N.E.2d 723, 730-31 (Ind. 2008) and *Clark's Sales & Serv., Inc. v. Smith*, 4 N.E.3d 772, 782 (Ind. Ct. App. 2014) ("a covenant that restricts the employee from competing with portions of the business with which he was never associated is invalid"), *trans. denied*.) ASI does not appear to be attempting to enforce any limitation on Knowles's provision to HWC of engineering services or any other type of services that he did not do at ASI.

purpose of building a relationship and trust to obtain business for . . . HWC."
*HWC Appellants' Br.* at 20-22. This reading, Defendants maintain, has the effect of "rendering Knowles a leper to any clients he dealt with at ASI and interfering with his constitutional rights of association" and constitutes an abuse of discretion. *Id.* at 22.

[33] Indeed, Indiana courts have recognized that non-competition agreements or covenants not to compete are "in restraint of trade and not favored by the law"; however, they are enforceable if they are reasonable. *Cent. Ind. Podiatry,* 882 N.E.2d at 729. To be reasonable, an agreement containing such a covenant (1) must protect legitimate interests of the employer; and (2) the restrictions established by the agreement must be reasonable in scope as to time, activity, and geographic area.[18] *Coates,* 942 N.E.2d at 913. An appellate court reviews a trial court's interpretation of restrictive covenants *de novo*. *Cent. Ind. Podiatry,* 882 N.E.2d at 729.

[34] Here, it is undisputed that, after joining HWC, Knowles continued to have interactions with ASI's clients. Those fell into two basic categories: (1) those that ASI views as business development, including such things as fishing trips, poker games, golf outings, and not-for-profit fundraisers, and various social, industry, and political events with ASI clients; (2) those that were part of his job

---

[18] Defendants focus the limitations on activity and do not challenge the geographic or time limitations imposed by the Knowles Agreement, other than the challenge to the extension provision, as addressed later in this decision.

in HWC's operations division and were connected to the contract-type work that he did, which occurred after HWC had been selected as the engineering firm on a project, but before the contract was negotiated and signed.

[35] With regard to the first category of interactions, involving attendance at such activities as industry, social, fundraising, and political functions, Knowles did not view his activities with these individuals to be in violation of the Knowles Agreement, testifying that because they were not connected to particular sales, and he did not seek to secure work from these contacts, they were not restricted activities. He explained that his attendance and involvement was not intended to secure work and was only to "build friendships." *HWC Appellants' Br.* at 4; *HWC Appellants' App.* at 76; *Tr.* at 632. Defendants also submitted testimony from ASI clients, who stated that Knowles informed them of his contractual objections and that he was not soliciting business from them.

[36] The trial court rejected Defendants' suggestion that Knowles's contacts with individuals at outside activities such as fishing, poker, social gatherings and not-for-profit activities were only in furtherance of friendships, relying in part on the testimony of Kenton Moore ("Moore"), ASI's Vice President of Field Sales, who worked closely with Knowles at ASI. Moore described that it is necessary to develop trust and relationships with clients and potential clients, and to that end, ASI's (and HWC's) sales teams get to know and spend time with clients, prospective clients, and their families. *HWC Appellants' App.* at 16; *Tr.* at 354, 358-62. Some examples include meeting for breakfasts, lunches, dinners, charitable functions, golf outings, trips, sporting events, conferences, networking

events, receptions, and political functions. All of these activities are paid for by the employer (here, ASI or HWC) because the activities build trust and goodwill. By building trust with clients and prospective clients, it is ASI's and HWC's goal to obtain future projects. The trial court's determination on the issue was based to a large extent on its assessment of the credibility of the witnesses. The trial court addressed this credibility aspect:

> With respect to ASI, Knowles testified that [] client development activities were designed to build relationships, trust, and goodwill for ASI.
>
> The purpose of Knowles' activities on behalf of HWC is exactly the same: to build and maintain relationships and goodwill, with the goal of eventually obtaining work for HWC. The Knowles Agreement prohibits him from doing these activities with his former ASI clients.
>
> . . . .
>
> **The court does not find it believable or reasonable that Knowles was not selling, trying to seek future projects, or was not trying to build a relationship of trust and confidence in him and his company, HWC**.

*HWC Appellants' App.* at 74, 77 (emphasis added). The trial court determined that Knowles's attendance at and participation in those types of activities, which were generally paid for by HWC, were to preserve his relationships with these clients and to maintain and develop goodwill and that, given the QBS selection process of the engineering industry, the personal relationships and

trust developed through years of contact and goodwill "are often determinative factors as to which engineering firm is selected for a project." *Id*. at 71, 74. The trial court was within its discretion in finding that engaging in such activities was for the purpose of selling, directly or indirectly, in violation of the Knowles Agreement.

[37] With regard to the other category of contacts with ASI clients, which involve Knowles's job responsibilities, Defendants note that Knowles's job at HWC was in the operations department, and not in sales, where he was at ASI. *HWC Reply Br*. at 14. Defendants further seek to distinguish what Knowles did at ASI versus what he did at HWC:

> While he was at ASI, Knowles was actively involved in making the pitch for clients to select ASI pursuant to the QBS process. . . . In contrast, at HWC, Knowles['s] role in new contracts is limited to reviewing fees, reviewing verbiage in contracts, and tracking down signatures for contracts—all of which comes after HWC has been selected by a client and which is internal within HWC.

*HWC Appellants' Br*. at 5; *HWC Reply Br*. at 7. Succinctly put, Defendants' position is that once the engineering firm has been selected, the "sale" has occurred (is complete), and, therefore, Knowles's subsequent contacts with the client, during which the fees and project's scope are discussed and determined, are not part of the sales process and do not violate his non-compete.

[38] The trial court rejected this argument, again relying in part on the testimony of Moore, who explained that the sales cycle in the public engineering industry is

lengthy and continuous; each of the many points of contact and connections with a client or prospective client before, during, and after the selection process are part of a company's efforts to gain and retain business. Moore stated that the project is not "a win" until after negotiations and the contract is signed. *ASI Ex.* 244; *Tr.* at 376.

[39] Contrary to Defendants' suggestion that the trial court's reading of the restrictive covenants was overbroad and unenforceable because it effectively precludes him from working at HWC in any capacity, Knowles can work with HWC clients in the same or similar manner in which he was employed at ASI, provided the clients are not clients he recently worked with at ASI. Nor does the non-compete restrict him from working in internal operations, including, as ASI suggests "performance management, human resources, recruitment of non-ASI employees, and company growth initiatives." *HWC Appellants' App.* at 105-06. It was the negotiation of contracts with ASI clients, after HWC had been awarded the bid but before contract was signed, that the trial court interpreted as violative of the Knowles Agreement. *Id*. at 106.

[40] On appeal, we are not to disturb a trial court's findings or judgment unless they are clearly erroneous, nor should we reweigh the evidence or reassess witness credibility. *Clark's Sales & Serv.*, 4 N.E.3d at 780. Rather, we are to consider only the evidence favorable to the judgment and all reasonable inferences therefrom. *Id*. Given this standard of review, we cannot say that the trial court's interpretation of the terms of the non-compete was improper. Its findings and conclusions were not clearly erroneous.

## C. Laches

Defendants argued to the trial court that ASI waited an unreasonably long period of time before filing its lawsuit and seeking injunctive relief, and, based on this delay, Defendants asked the trial court to apply the doctrine of laches to preclude ASI from enforcing the Knowles Agreement. The equitable doctrine of laches contains three elements: (1) inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) a change in circumstances causing prejudice to the adverse party. *Gleeson*, 883 N.E.2d at 179-80. "Laches does not turn on time alone. . . . Unreasonable delay causing prejudice or injury is necessary." *Id.* at 180. Prejudice may be created if a party, with knowledge of the relevant facts, permits the passing of time to work a change of circumstances by the other party. *Id.* The question of laches is one to be determined by the court in the exercise of its sound discretion. *Ind. Real Estate Comm'n v. Ackman*, 766 N.E.2d 1269, 1273 (Ind. Ct. App. 2002). For a decision to be reversed on appeal, an abuse of discretion must be clearly demonstrated. *Id*.

Defendants argue that ASI was aware of Knowles's new position at HWC when he left ASI in May 2014 and was aware that, during the summer and fall of 2014, Knowles had some social interaction, such as golfing, fishing, and fundraiser events, with ASI clients, yet ASI did not take any action against Knowles until ten months later when it filed suit on March 6, 2015. The trial court rejected the laches argument, finding that the delay was reasonable, and we agree.

[43]   The record reveals that, almost immediately after Knowles's departure, ASI knew that Knowles took the position with HWC. ASI was aware of three or four instances in the summer and fall of 2014 where Knowles was observed interacting at social, political, or networking events with individuals who were at that time ASI clients. ASI did not deem that any action was necessary. However, later in 2014 and into early 2015, after information "slowly trickled in," ASI began to learn of the activities and communications occurring between HWC and ASI employees, and in early 2015, ASI launched an internal investigation, which further revealed to ASI that HWC, through the actions of Knowles, Day, and Lancet, among others, was "recruiting ASI's employees." *ASI Appellee's Br.* at 41, 45. In March 2015, ASI filed its lawsuit. While the better practice may have been for ASI to contact Knowles, Day, and Lancet, voice objection to those activities of which ASI was aware, and request that they cease from the activities, we cannot say that ASI's decision to internally investigate and consult with counsel before filing suit constituted an unreasonable delay. Furthermore, even if the delay was considered unreasonable, Defendants have failed to show that they were prejudiced by any such delay, arguing only that ASI's delay "worked a change in Knowles'[s] circumstances" because "Knowles settled into his new job and started to build a life at HWC." *HWC Appellants' Br.* at 29. This general statement does not identify prejudice. The trial court did not abuse its discretion when it rejected Defendants' claim that a ten-month delay in filing suit and fourteen-month delay in seeking injunctive relief constituted laches.

## II. Enforcement of Non-Solicitation Agreements

[44] Section 9(e) of the Knowles Agreement restricted him and his future employer as follows:

> During the Restricted Time Period, Employee will not solicit, recruit, hire, employ, attempt to hire or employ, or assist any person or entity in the recruitment or hiring of, any person who is an employee of the Company, or otherwise urge, induce or seek to induce any person to terminate his/her employment with the Company.

*Joint Ex*. 235. Under Section 9(h) Knowles was prohibited from doing so directly or indirectly. *Id*. The Lancet Agreement[19] provided that while Lancet was employed by ASI and for a period of two years after his employment with ASI concluded, Lancet would not

> solicit or endeavor to entice away, provide information to others purposely with the intent of helping them solicit or entice away, knowingly offer employment to, knowingly employ, or offer or conclude any contract for services with, any person who is employed by [ASI] at the date your employment with [ASI] ceases.

*Joint Ex*. 234. The Day Agreement contained a non-solicitation provision identical to the Lancet Agreement. *Joint Ex*. 8.

---

[19] Previous to signing the Lancet Agreement in January 2007, Lancet had signed in April 2004 an Employment Agreement, which included non-solicitation and non-competition provisions. *Joint Ex*. 144. The 2007 Lancet Agreement set forth the Terms and Conditions of his then-current employment, as well as a non-solicitation provision. *Joint Ex*. 234.

[45] Following the hearing, the trial court enjoined HWC, Knowles, Day, and Lancet as follows:

> Knowles, Day and Lancet shall not, directly or indirectly, have any communication with, solicit, recruit, hire, employ, attempt to hire or employ, or assist any person or entity (including but not limited to HWC) in the recruitment or hiring of any person who is an employee of ASI, or otherwise urge, induce or seek to induce any person to terminate his/her employment with ASI.

*HWC Appellants' App.* at 98-99.

[46] In challenging the injunction, Defendants do not claim that the non-solicitation provision are unenforceable or that Defendants did not engage in the alleged solicitation or recruitment of ASI employees. Rather, they argue that there was no pending threat of recruiting activity, and thus no need for an injunction to enjoin it. That is, "any alleged recruiting activity was completed" by the time the lawsuit was filed in March 2015. *HWC Appellants' Br.* at 17. Further, Defendants assert, there was no evidence that ASI "suffered any cognizable harm" from the loss of seven employees. *Id*. at 17.

[47] The record reveals, however, that one of HWC's primary objectives in hiring Knowles was to rebuild its transportation department, including recruiting and maintaining a better staff of employees. According to ASI, Knowles and HWC engaged "in a calculated scheme to raid ASI . . . of its employees and of its talent" and that Knowles and HWC, aware of the recruiting restrictions in the Knowles Agreement, "enlisted the help of Day and Lancet" to target at least eighteen ASI employees. *ASI Appellee's Br*. at 21, 44. While Defendants urge

that any recruiting was complete by the time the complaint was filed, and would not happen anymore, there was no assurance of that. Indeed, when Knowles left ASI in May 2014, he expressed to ASI that he would abide by the Knowles Agreement, but near the end of 2014, ASI learned – through its employees and by receiving an email intended for Knowles at HWC – of the recruiting efforts. In issuing the injunction, the trial court expressly issued conclusions with regard to its credibility determinations. As to Lancet, the trial court stated:

> This Court finds that the following witnesses were not credible at all as they lied in previous testimony and or statements or/and they admitted they lied or they were deceptive to others purposefully: Lancet and Sparks. In addition, it was clear to the court after judging their (Lancet and Sparks) demeanor and content of their testimony that i[t] was not credible and should not be relied upon by this Court.

*HWC Appellants' App.* at 79. As to Day and Knowles, the trial court determined that their testimony "was not credible or believable in light of all the evidence." *Id.* at 80. We do not reweigh evidence or assess witness credibility on appeal. *Clark's Sales & Serv.*, 4 N.E.3d at 780. Based on the record before us, the trial court was within its discretion to issue the injunction to prevent further recruitment, or the threat of it, by Knowles, Day, and Lancet.

[48] Defendants also contend on appeal that the injunction was inappropriate, based on a lack of notice to Day and Lancet, since ASI did not give Day or Lancet a copy of their respective Agreements when either of them left ASI's

employment, nor did ASI remind either of them that they had signed such an Agreement, years prior and were bound by the non-solicitation provisions.[20] *HWC Appellants' Br.* at 29-33. Their argument is grounded in equitable principles,[21] *i.e.*, "he who seeks equity, must do equity" and they argue that, here, "ASI's affirmative choice not to provide notice should bar it from securing injunctive relief[.]" *HWC Appellants' Br.* at 32; *HWC Reply Br.* at 26.

[49]  In this case, evidence was presented to support the trial court's determinations that HWC through the efforts of Knowles, Day, and Lancet solicited or recruited, or assisted in the soliciting and recruiting of ASI employees. Lists of potential candidates were made and shared. Discussions were had, and interviews occurred, some at restaurants, homes, and through outside email servers. From this and other evidence, the trial court could make the reasonable inference that Knowles, Day, and Lancet knew that they were bound by non-solicitation restrictions. Furthermore, the trial court was

---

[20] Defendants assert a lack-of-notice argument as to Day and Lancet only. *See HWC Appellants' Br.* at 29-33. Thus, any argument that Knowles lacked notice of the non-solicitation aspect of the Knowles Agreement is waived. Ind. Appellate Rule 46(A)(8).

[21] In their *Appellants' Brief*, Defendants argued that "ASI had a duty to provide notice . . . of what those restraints were, and then prove that the restraints were reasonable. ASI did not." *HWC Appellants' Br.* at 31; *see also id.* at 29 ("This Court has not yet addressed whether an employer has an affirmative duty to provide a former employee with a copy of or a reminder notice of a restrictive covenant signed by the employee[,]" and "This case reveals why such a duty of notice should be required."). In response, ASI argued that Indiana has not recognized a duty upon employers to either remind employees that they had signed a restrictive covenant or to provide them with a copy of it upon their departure. Defendants, in their *Reply Brief*, explain that they are not asking the court to recognize a new tort duty; rather, they are proposing that before an employer can secure injunctive relief through a trial court's equitable powers, the employer must provide notice to the employee of the limitations of an existing restrictive covenant. *HWC Reply Br.* at 25 n.10. Thus, we do not make any duty analysis in our decision.

precluded from enforcing the provisions of the non-solicitation agreements through a preliminary injunction because Day and Lancet stated that they did not remember signing such documents. Indeed, the trial court expressly found that it did not deem them credible witnesses. The trial court did not abuse its discretion in issuing the injunction enjoining Defendants from violating the non-solicitation provisions of their respective Agreements.

## III. Dissolution of the Injunction as to Knowles

[50] In April 2016, Knowles filed a motion asking the trial court to dissolve the enforcement of the restrictive provisions of the Knowles Agreement, arguing that the 24-month restriction began when Knowles left ASI on May 14, 2014 and it ended on May 14, 2016. The trial court agreed with Knowles and dissolved the injunction effective May 14, 2016. We review a trial court's decision to dissolve or refuse to dissolve a preliminary injunction for an abuse of discretion. *Gilmer v. Bd. of Comm'rs of Marshall Cnty.*, 428 N.E.2d 1318, 1319 (Ind. Ct. App. 1981). "To the extent that the trial court was required to find facts with respect to what the proper length of the injunction should be," we apply "the traditional deferential standard of review where facts have been found." *Oxford Fin. Grp. Ltd. v. Evans*, 795 N.E.2d 1135, 1141-42 (Ind. Ct. App. 2003). "To the extent the trial court's decision turned on contract interpretation," the standard of review is *de novo. Id*. at 1142.

[51] Here, the Knowles Agreement contained a 24-month restriction, which began to run "from the time at which [Knowles] ceases to provide services to [ASI] in

any manner whatsoever[.]" *HWC Appellants' App.* at 135, 137. Section 9(i) of the Knowles Agreement contained the following extension clause in the case of a violation:

> In the event Employee violates any of the non-competition covenants contained in this Section 9, the duration of all non-competition covenants (and the Restricted Time Period) shall automatically be extended by the length of time during which Employee was in violation of such covenant, including, but not limited to, **an extension equal to the time period from the date of Employee's first violation until an injunction is entered enjoining such violation.**

*Id.* at 137 (emphasis added).

[52]     ASI opposed Knowles's request for the trial court to dissolve the injunction on May 14, 2016, arguing that Section 9(j) of the Knowles Agreement, which Knowles voluntarily signed, contained a provision that tolled the time period by extending the non-compete by the amount of time from Knowles's first violation until the entry of an injunction. Knowles, however, urged that Indiana case law, specificall*y Kuntz v. EVI, LLC*, 999 N.E.2d 425 (Ind. Ct. App. 2013), precludes a trial court from extending the duration of a non-compete through a preliminary injunction. Agreeing with Knowles and relying on *Kuntz*, the trial court in this case found that "the preliminary injunction cannot be extended because to do so would violate the purpose of a preliminary injunction as stated in *Kuntz* and so it must be dissolved [as to Knowles]." *ASI's Appellant's App*. Vol. II at 22. We agree.

In *Kuntz*, Kuntz owned and operated a business, which he sold to JS Hare, and as part of the deal, he signed a covenant not to compete on December 12, 2011. It provided, in relevant part:

> For purposes of this Agreement, "Non-compete Period" shall mean the period that begins on the effective date of this Agreement and **ends on October 7, 2014, except that the "Non-Compete Period" shall be extended by the duration of any violation by [Kuntz]** of the terms of Paragraph 2 of this Agreement.

999 N.E.2d at 428 (emphasis added). Eventually, JS Hare sold the business to EVI, LLC, which at some point suspected that Kuntz was violating the non-compete. EVI filed suit, and the trial court granted a preliminary injunction on December 17, 2012. The trial court granted EVI's request to extend the preliminary injunction for an additional eight months, from October 7, 2014 (the stated "end" date of the non-compete) until June 7, 2015, explaining that Kuntz's violations of the non-compete commenced around the beginning of April 2012 and continued until December 2012, when the trial court enjoined Kuntz from violating the non-compete. *Id*. at 432.

On appeal, the *Kuntz* court reversed, concluding that a preliminary injunction was not an appropriate vehicle to extend the terms of a non-compete. It based its decision on the recognized purpose of a preliminary injunction, which is: "'to preserve the *status quo* as it existed before a controversy, pending a full determination on the merits of the dispute.'" *Id*. (quoting *Stoffel v. Daniels*, 908 N.E.2d 1260, 1272 (Ind. Ct. App. 2009)). And "[t]he *status quo* is the 'last,

actual, peaceful and non-contested status which preceded the pending controversy.'" *Id.* (quoting *N. Ind. Pub. Serv. Co. v. Dozier*, 674 N.E.2d 977, 987 (Ind. Ct. App. 1996)). The *Kuntz* court explained that the last uncontested position of the parties was the non-compete agreement as it existed prior to litigation, which was enforceable until October 7, 2014, and the extension of the non-compete beyond the October 7, 2014 end date was "premature at this stage of the litigation and goes beyond the purpose of the preliminary injunction." *Id.*

> Any court-ordered extension of the Non[-]compete Agreement would be appropriate only after a full examination of the case on the merits and a final determination that a violation occurred. Therefore, we conclude that the trial court abused its discretion by extending the duration of the Non[-]compete Agreement as part of the preliminary injunction.

*Id.*

[55] ASI seeks to distinguish *Kuntz* and argues that, unlike the Knowles Agreement, the agreement in *Kuntz* did not contain a provision that contemplated the extension of the non-compete upon the entry of a preliminary injunction: "The *Kuntz* [a]greement simply provided that the period 'shall be extended by the duration of any violation'" and "was silent on whether the non-compete period could be extended as part of an injunction entered by the court." *ASI Appellant's Br.* at 25. However, we are not persuaded that this distinction makes a difference. The non-compete agreements both in the present case and the *Kuntz* case contemplated that they will be extended by the duration of any violation

and by the length of time the employee was in violation. We find, as did the trial court, that *Kuntz* is directly applicable and precluded the trial court from applying the Section 9(i) extension provision of the Knowles Agreement at this stage of the litigation.[22]

[56] Lastly, ASI asks us to reverse the trial court's determination that Knowles was not equitably estopped from obtaining dissolution of the injunction. ASI had argued, and the trial court rejected, the position that Knowles, due to his deceptive conduct, should be equitably estopped from obtaining dissolution of the injunction. The party claiming equitable estoppel must show (1) its lack of knowledge and of the means of knowledge as to the facts in question, (2) its reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change his position prejudicially. *Money Store Inv. Corp. v. Summers*, 849 N.E.2d 544, 547 (Ind. 2006). In this case, the trial court determined that "ASI either had knowledge that Knowles was in violation of his Non-Compete or that ASI had the means of obtaining such knowledge to determine whether Knowles was in violation of his Non-Compete Agreement

---

[22] ASI observes that "at least one other Indiana reported case analyzed the extension of the duration of a non-compete clause without holding that extension clauses are *per se* unenforceable," namely, *Oxford Financial Group, Ltd. v. Evans*, 795 N.E.2d 1135 (Ind. Ct. App. 2003). *ASI Appellant's Br.* at 27. ASI argues that because the *Oxford* court did not simply state that extension clauses are *per se* unenforceable and, rather, engaged in an "extensive analysis" of the extension clause, we can infer that, in the right circumstances, an extension clause may be enforceable to extend a non-compete via a preliminary injunction. The trial court in the present case recognized *Oxford* in its findings and conclusions, finding that it was relevant, but determined that "*Kuntz* overruled it" *ASI Appellant's App*. at 21-22. We too agree that *Kuntz* controls; it was more recently decided and spoke more directly to the issue at hand. To the extent that *Oxford* could be viewed as valid despite the *Kuntz* decision, we respectfully decline to follow it.

as early as May of 2014[,]" concluding that ASI did not meet the three requirements for application of equitable estoppel. *ASI Appellant's App*. Vol. II at 24. We agree.

[57] With regard to the "lack of knowledge" element of the inquiry, the record reveals that, although ASI may not have known of the extent of the violations of the Knowles Agreement, it was aware in May 2014 that Knowles went to work for competitor HWC and was aware of at least three or four instances during the summer of 2014 that Knowles had interaction with ASI clients at events or outings. In September 2014, when Sparks inadvertently sent an email to Knowles's old ASI email address, ASI discovered that Knowles and ASI were involved in the recruitment of at least Tolle. We agree with the trial court that ASI failed to establish lack of knowledge sufficient to equitably estop Knowles from proceeding on his motion. Furthermore, with regard to the second and third prongs of the equitable estoppel inquiry, *i.e.*, reliance upon the conduct of the party estopped, and action based thereon of such a character as to change his position prejudicially, ASI offers one sentence, stating that it relied on Knowles's representation that he would honor his restrictive covenants "and did not take immediate legal action based on those representations." *ASI Appellant's Br*. at 41. This general statement does not explain in what way ASI was prejudiced, and we find it does not satisfy the second and third prongs of the equitable estoppel inquiry. The trial court did not abuse its discretion when it granted Knowles's motion and dissolved the preliminary injunction on May 14, 2016.

Affirmed.

Robb, J., concurs.

Baker, J., concurs with separate opinion.

| | |
|---|---|
| Hannum Wagle & Cline Engineering, Inc., d/b/a HWC Engineering, Inc., et al., | Court of Appeals Case No. 49A05-1601-PL-33 |
| *Appellants/Appellees-Defendants,* | |
| v. | |
| American Consulting, Inc., d/b/a American Structurepoint, Inc., | |
| *Appellee/Appellant-Plaintiff.* | |

**Baker, Judge, concurring.**

I am compelled to concur fully with the majority opinion, but I write separately to voice my serious concerns about the extreme breadth of clause two of the relevant provision in the Knowles Agreement. Specifically, Knowles may not "solicit *or communicate* with any such customers for the purpose of selling, providing, attempting to sell or provide, or assisting any person or entity in the sale or provision of, any Competing Products/Services[.]" HWC Appellant's

App. p. 135-37 (emphasis added). To tell a person who works in sales that he may not even communicate with past or potential clients is to take away his proverbial bread and butter. He may no longer schmooze. That is far too draconian to sit comfortably with me. And in this case, it goes a step farther, because the past and potential clients are all government employees, which takes it even farther into an overly restrictive realm.

[60] We have largely moved as a society from an economy of goods to an economy of services. The disfavor with which this State views restrictive covenants should be heightened, in my view, where the purported irreparable harm *cannot* be quantified—which is almost always the case when it is the provision of services that is at the heart of a restrictive covenant. Under these circumstances, I believe only the narrowest of restrictive covenants should be enforceable, and I do not believe that clause two of the Knowles Agreement qualifies.[23] With the current state of caselaw, however, I am compelled to concur fully with the majority opinion.

---

[23] I have no reservations whatsoever about the drafting or enforcement of the provisions in these agreements prohibiting former ASI employees from poaching other ASI employees to work for HWC.