

**FILED**

Oct 13 2017, 10:54 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Kevin W. Betz
Sandra L. Blevins
Benjamin C. Ellis
Betz + Blevins
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Adam Arceneaux
Derek R. Molter
Kaitlyn J. Marschke
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Craig Vickery,

*Appellant-Defendant,*

v.

Ardagh Glass Inc.,

*Appellee-Plaintiff*

October 13, 2017

Court of Appeals Case No.
49A02-1702-PL-330

Appeal from the Marion Superior
Court, Indiana Commercial Court

The Honorable Heather A. Welch,
Judge

Trial Court Cause No.
49D01-1606-PL-23465

**Baker, Judge.**

[1] Craig Vickery appeals the trial court's order granting Ardagh Glass, Inc.'s (Ardagh), motion for a preliminary injunction. Vickery raises the following arguments on appeal: (1) the trial court erred in granting a temporary restraining order when allegedly insufficient notice was provided to Vickery; and (2) the trial court erred in entering a preliminary injunction preventing Vickery from going to work for one of Ardagh's competitors.

[2] We find that Vickery received insufficient notice of the temporary restraining order proceeding, but that he has waived the right to seek relief on the issue. We further find that the trial court did not err by entering the preliminary injunction. We affirm and remand for further proceedings.

## Facts[1]

[3] Ardagh is a manufacturer of glass containers and bottles; it sells its products to companies in the food and beverage industries. It is the North American business unit of the international holding company Ardagh Group.

[4] Through a share purchase agreement executed in January 2013 and closed in April 2014, Ardagh Glass Containers, Inc., purchased 100% of the stock of Saint-Gobain Containers, Inc. (SGCI), which is a wholly-owned subsidiary of

---

[1] We held oral argument in Indianapolis on September 25, 2017. We thank counsel for both parties for their able written and oral presentations.

Saint-Gobain Corporation (SGC).  Following the purchase, the two companies merged and became known as Ardagh Glass, Inc.

Vickery began working for SGCI on September 8, 2004, as a temporary employee.  Two days later, he was hired by SGCI as a full-time mould engineer.  That day, September 10, 2004, Vickery signed a Noncompete Employee Agreement (the Noncompete).  The Noncompete explicitly states that Vickery signed it "'in consideration of my employment, continued employment, increased compensation, change in responsibility, or other benefit . . . .'"  Prelim. Inj. Order p. 5 (quoting Noncompete).  Among other things, the Noncompete provided that Vickery could not work for a competitor for one year following his departure from SGCI:

> "I shall not, without written consent signed by an officer of the Company, directly or indirectly (whether as owner, partner, consultant, employee or otherwise), at any time during the one-year period following termination of my employment with the company, engage in or contribute my knowledge to any work or activity that involves a product, process, apparatus, service or development (i) which is then competitive with or similar to a product, process, apparatus, service or development on which I worked or (ii) with respect to which I had access to Confidential Information while at the Company at any time during the period prior to such termination."

*Id.* (same).  The Noncompete also required Vickery to protect the company's trade secrets and confidential information.

[6] In 2012, Vickery was promoted to Senior Mould Engineer; he held that position until he left the company in June 2016. As part of his responsibilities, Vickery designed mould equipment for the company's manufacturing process, designed replacement moulds, and designed moulds for new products. He supplied mould vendors with detailed engineering drawings; the vendors would then create equipment to match the drawings. Vickery was also involved in "trouble shooting," or coming up with remedies for problems with the company's mould designs. *Id.* at 9. Additionally, he interacted with manufacturing plants and the product design department, and was involved with the implementation of Ardagh's European design engineering standards and best practices throughout its North American plants.

[7] After Vickery was passed over for a promotion in February 2016, he began looking for a new employer. His uncle works for Owens-Illinois, one of Ardagh's primary competitors. Vickery interviewed with Owens-Illinois for the position of Mould Design Specialist and provided Owens-Illinois with a copy of the Noncompete in advance. On June 1, 2016, he was offered and accepted that position with Owens-Illinois. That position would include duties that are substantially similar to Vickery's duties at Ardagh.

[8] On June 6, 2016, Vickery tendered his resignation letter to Ardagh; he omitted the fact that he was going to work for Owens-Illinois. He then engaged in additional communications with Owens-Illinois employees, including his uncle, regarding the potential impact of the Noncompete. On June 16, 2016, Vickery disclosed to Ardagh's upper management that he was going to work for Owens-

Illinois. Ardagh advised Vickery to review his Noncompete to ensure he would remain in compliance and worked to persuade Vickery to stay with Ardagh. On June 22 or June 23, Ardagh informed Vickery it intended to enforce the Noncompete. On June 23, Ardagh gave Vickery a letter from outside counsel requesting that Vickery provide the details of his new position at Owens-Illinois and threatening a lawsuit that would include a request for injunctive relief. Vickery never responded.

[9] On the morning of June 30, 2016, the last day of Vickery's employment with Ardagh, Ardagh's counsel notified Vickery via email that it would be filing suit with the Commercial Court later that day, requesting a temporary restraining order (TRO) and injunction, and attached the pleadings it intended to file. Vickery did not respond, instead emailing his uncle that "things just got serious on the legal front as of 11:00 a.m. today." *Id.* at 28.

[10] On June 30, 2016, Ardagh filed a complaint against Vickery to enforce the Noncompete and to protect its trade secrets. That same afternoon, without holding a hearing, the trial court issued an ex parte TRO directing Vickery to cease and desist from "using Ardagh's trade secrets and confidential information to compete against Ardagh;" to refrain from "communicating with or recruiting any of Ardagh's employees;" and to cease and desist from "participating or working on mould engineering, bottle design, or similar roles on behalf of Ardagh's main competitor, Owens-Illinois, Inc." Appellant's App. Vol. II p. 48. The trial court scheduled a hearing for July 8, 2016.

[11] On July 5, 2016, Vickery's counsel entered an appearance and requested an extension on all TRO deadlines. The trial court granted the request, noting that Vickery "agrees to a continuance of the TRO entered by the Court on June 30, 2016 until the preliminary injunction hearing and to combining the hearing on the TRO with a hearing on the request for a preliminary injunction." Appellee's App. Vol. II p. 32. The order scheduled the combined TRO/preliminary injunction hearing for a full day on July 27, 2016, and a half-day on July 28, 2016.[2]

[12] On July 27, 2016, Vickery filed a motion to vacate the TRO and to dismiss the complaint. Among other things, Vickery argued that he did not receive sufficient notice of the TRO proceeding and that Ardagh did not have standing to enforce the Noncompete. On August 12, 2016, Ardagh filed a motion for partial summary judgment, seeking judgment as a matter of law that it has standing to enforce the Noncompete. The trial court granted Ardagh's motion for partial summary judgment and denied Vickery's motion to dismiss on November 15, 2016. On January 13, 2017, the trial court issued a detailed sixty-three-page order granting Ardagh's motion for preliminary injunction. Vickery now brings this interlocutory appeal.

---

[2] The hearing ultimately spanned multiple days: July 27-29; August 23; September 2, 7, and 9; and November 17.

# Discussion and Decision

## I. Indiana Commercial Court

On September 25, 2017, the day on which we held oral argument, Vickery filed a motion to dismiss the entire lawsuit for lack of constitutional jurisdiction. He raises the following arguments in his motion: (1) our Supreme Court exceeded its authority by establishing the Commercial Court; (2) our Supreme Court lacks the authority to appoint the Commercial Court judges; (3) the Commercial Court bestows unconstitutional privileges on business entities; and (4) the Commercial Court permits corporate plaintiffs to compel individual defendants to distant venues, creating an extreme hardship.

Vickery acts as though litigating in the Commercial Court is compulsory if the plaintiff files a complaint there. That, however, is patently untrue. Our Supreme Court has promulgated Interim Commercial Court Rules, and Interim Rule 4(D)(3) plainly states that if a party to litigation that was filed in a Commercial Court files a Refusal Notice within thirty days of being notified that the case was filed in Commercial Court, then the clerk "*shall* transfer and assign the case to a non-Commercial Court Docket . . . ." (Emphasis added). Indeed, the Commentary to Interim Rule 4 even emphasizes that "every other party has an absolute veto" of the placement of a case on the Commercial Court docket. Interim Rule 4 cmt. 1. Only where, as here, no Refusal Notice is timely filed will the case be permanently assigned to a Commercial Court docket.

In this case, Vickery did not file a Refusal Notice within thirty days. And not until now did he object to the jurisdiction of the Commercial Court. He attempts to argue that he is raising questions regarding the subject matter jurisdiction of the Commercial Court, which can be raised at any point in time, but that is not what he is actually challenging. The Commercial Court is (in this case) part of the Marion Superior Court, which unquestionably has subject matter jurisdiction over this litigation. *See* Ind. Code § 33-29-1-1.5 (providing that all standard superior courts have original and concurrent jurisdiction in all civil cases). Despite Vickery's attempt to reframe the issue otherwise, he is actually challenging the Commercial Court's *personal* jurisdiction over him, which is a waiveable argument. *E.g.*, *Harris v. Harris*, 31 N.E.3d 991, 995 (Ind. Ct. App. 2015). And here, indeed, he has consented to the Commercial Court's personal jurisdiction over him by failing to object to it and by failing to file a Refusal Notice. Under these circumstances, Vickery has waived the right to challenge the Commercial Court's jurisdiction or authority and we deny his motion to dismiss by separate order.

# II. TRO

Vickery first argues that the preliminary injunction should be reversed because it is based upon a TRO that he claims violated Indiana Trial Rule 65(B) and his constitutional right to due process.

Initially, Ardagh responds that the propriety of the TRO is not properly before this Court and we should not even consider it. A TRO is not appealable as of

right.  *Witt v. Jay Petroleum, Inc.*, 964 N.E.2d 198, 203 (Ind. 2012).  Here, Vickery did not request that the trial court certify the TRO for a discretionary interlocutory appeal.  Furthermore, Ardagh notes that the TRO was superseded by the preliminary injunction, meaning that any issues with respect to the TRO are moot.  *Nordman v. N. Manchester Foundry, Inc.*, 810 N.E.2d 1071, 1073 n.2 (Ind. Ct. App. 2004).  We acknowledge the issues surrounding the reviewability of the TRO, but elect to consider the process that took place in this case because it is an issue of utmost public importance that is likely to recur in the future.

[18]  Generally, a party taking action in a legal proceeding against another party must provide notice to the adverse party.  *See* Ind. Trial Rules 3 (commencement of an action), 4-4.17 (process and summons), 5 (service of pleadings and other papers).  Under certain exceptions, however, a TRO may be granted without notice to the adverse party.  Indiana Trial Rule 65(B) sets forth the requirements for the notice exception to apply:

> A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if:

> (1)     it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition; and

> (2)     the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give notice and the reasons supporting his claim that notice should not be required.

Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed ten [10] days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the whereabouts of the party against whom the order is granted is unknown and cannot be determined by reasonable diligence or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record. In case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a preliminary injunction and, if he does not do so, the court shall dissolve the temporary restraining order. On two (2) days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

Our Supreme Court has noted that when a TRO is sought, "the basic safeguards provided by Trial Rule 65(B) are essential to due process and must be followed." *In re Anonymous*, 43 N.E.3d 568, 570 (Ind. 2015) (noting that both attorneys and judges have ethical obligations to ensure compliance with Trial Rule 65(B)).

[19] Here, at 11:00 a.m. on June 30, 2016, Ardagh's counsel notified Vickery via email that it would be filing a lawsuit with the Commercial Court later that day and attached the pleadings it intended to file. While the attachments indicated that the lawsuit would be filed in a Commercial Court in Marion County, they did not indicate the date, time, or specific location of a hearing. Indeed, the trial court issued the TRO at 4:12 p.m. that same day without holding a hearing at all. TRO Order p. 5.

[20] We cannot conclude that notice of an intent to file a lawsuit amounts to sufficient notice enabling the adverse party to appear in court in opposition to the proceeding. Furthermore, serving pleadings via email only complies with the Indiana Trial Rules under specific circumstances that were not present in this case, and counsel for Ardagh conceded as much at oral argument. *See* T.R. 4.1(A) (summons and complaint may not be served via email), 5(B) (party may serve another party via email only when the party being served has consented to service by email). We can only conclude, therefore, that to meet the requirements of due process and the Indiana Trial Rules, this proceeding had to have qualified for the notice exception provided for by Indiana Trial Rule 65(B).

[21] As noted above, Trial Rule 65(B) provides that a TRO may be granted without notice to the adverse party only if (1) the affidavit or verified complaint aver that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition; and (2) the applicant's attorney certifies to the court in writing the efforts made

to give notice and the reasons supporting the claim the notice should not be required. Ardagh's verified complaint does not make the showing required by Trial Rule 65(B)(1). Appellee's App. Vol. II p. 2-13. And the attorney certificate does not include reasons supporting a claim that notice should not be required. Appellant's App. Vol. II p. 128. Therefore, this TRO litigation does not meet any of the Trial Rule 65(B) requirements for proceeding without notice to the adverse party.

[22] After the TRO was granted without legally sufficient notice to Vickery, he could have objected, demanded a hearing, and/or sought to dissolve the TRO altogether. *See* T.R. 65(B) (if TRO is granted without notice, adverse party "may appear and move its dissolution or modification and in that event the court *shall* proceed to hear and determine such motion") (emphasis added). Had he done so, the outcome on appeal may have been different. Instead, however, Vickery's counsel entered an appearance and requested an *extension* of the TRO and agreed to combine the preliminary injunction and TRO hearings. Appellee's App. Vol. II p. 32. By taking this course of action, Vickery waived any objection he may have had to the TRO process, including the lack of legally sufficient notice.

[23] On July 27, 2016, the first day of the TRO/preliminary injunction hearing, Vickery filed a motion to vacate the TRO. At oral argument, counsel for Vickery argued that this action kept the issue alive and reviewable. We cannot agree. A party may not un-waive an issue by attempting to revive it after it has been waived. In this case, by requesting to extend the TRO and agreeing to

combine the TRO and preliminary injunction hearings, Vickery waived any arguments related to the TRO and we will not dispose of the appeal in this fashion.

That said, we caution attorneys and trial courts around the state to be mindful of the notice requirements surrounding TROs. There are circumstances in which a TRO must truly be granted immediately without affording time to the adverse party to respond, but those circumstances must strictly meet the requirements set forth by Trial Rule 65(B). In all other cases, both the applicant party and the trial court are required by due process and the trial rules to ensure that the adverse party was given legally sufficient notice before final action is taken.

## III. Preliminary Injunction

## A. Standard of Review

To obtain a preliminary injunction, the movant must show (1) a reasonable likelihood of success on the merits; (2) the remedies at law are inadequate and there will be irreparable harm during the pendency of the action; (3) the threatened injury to the movant from denying the motion outweighs the potential harm to the nonmovant from granting the motion; and (4) the public interest would not be disserved by granting the injunction. *E.g.*, *Hannum Wagle & Cline Eng'g, Inc. v. Am. Consulting, Inc.*, 64 N.E.3d 863, 873 (Ind. Ct. App. 2016).

In reviewing a trial court's ruling on a motion for preliminary injunction, we must determine whether the evidence supports the trial court's factual findings and whether the findings support the judgment. *Id.* at 874. In considering the findings of fact, we must determine whether they were clearly erroneous; in other words, when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* We will consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom, and will neither reweigh the evidence nor reassess witness credibility. *Id.* We apply a de novo standard of review to the trial court's conclusions of law. *Avemco Ins. Co. v. State ex rel. McCarty*, 812 N.E.2d 108, 115 (Ind. Ct. App. 2004).

## B.  Likelihood of Success on the Merits:  Noncompete

### 1.  Right to Enforce Noncompete

Vickery first contends that because Ardagh is not a party to the 2004 Noncompete and because the Noncompete is not assignable, Ardagh may not enforce it against Vickery.[3]

Under the Noncompete's choice of law provision, Pennsylvania law applies to the document. Appellee's App. Vol. II p. 17. The Pennsylvania Supreme Court has held that when, as here, there is no assignability provision in a

---

[3] Vickery also initially argues that Ardagh has never established that it was his employer. But from the outset, both sides agreed that Vickery worked for Ardagh. Vickery took that position in his counterclaim, his summary judgment motion, and his proposed order for the preliminary injunction. Appellee's App. Vol. III p. 14, 51; Appellant's App. Vol. VI p. 2-6. Consequently, he has waived the right to make any argument to the contrary.

restrictive covenant not to compete, the covenant is not assignable. *Hess v. Gebhard & Co.*, 808 A.2d 912, 922 (Pa. 2002). Pennsylvania has also, however, held that "when an individual, group of individuals or company purchases some or all of the stock in a corporation, the corporation's shareholders change, but the corporation itself remains the same legal entity as it was prior to the stock purchase." *Missett v. Hub Int'l Pa., LLC*, 6 A.3d 530, 535 (Pa. Super. Ct. 2010). In other words, unlike a sale of assets, a sale of stock does not alter the identity of the employer holding the restrictive covenant and, therefore, does not require an assignment of the restrictive covenant to a new entity. *Id.* at 536-38.

[29] In this case, the relevant timeline of events and parties is as follows:

- In September 2004, Vickery was hired by SGCI and signed the Noncompete. The "Company" that was the other party to the agreement was SGC and/or its affiliates, including SGCI.[4] Appellee's App. Vol. II p. 15.
- In January 2013, Ardagh Glass Containers, Inc., purchased 100% of the stock of SGCI.
- Following that purchase, Ardagh Glass Containers, Inc., and SGCI merged and became known as Ardagh.

Ardagh, Ardagh Glass Containers, Inc., and SGCI are/were organized under the laws of the state of Delaware, so Delaware law governs issues related to

---

[4] Although Vickery argues that only SGC was a party to the Noncompete, the plain language of the agreement includes SGC's affiliates. Appellee's App. p. 15. And in the Noncompete itself, SGCI is explicitly named as an SGC affiliate. Consequently, SGCI was a party to and had the right to enforce the agreement.

their corporate form and governance. Pursuant to Delaware law, when Ardagh Glass Containers, Inc., acquired 100% of the outstanding shares of SGCI's common stock, it acquired all of SGCI's rights associated with the stock, including contractual rights held by SGCI before the stock purchase. *E.g.*, Del. Code tit. 8, § 302; *Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 99 (Del. Ch. 2009).

[30] Consequently, under Delaware law, Ardagh Glass Containers, Inc., which became Ardagh, acquired all of SGCI's contractual rights following the stock purchase. Under Pennsylvania law, a stock purchase does not alter the corporate identity of the employer holding the restrictive covenant. In other words, Ardagh stepped into the shoes of SGCI and acquired all of its rights, including those related to the Noncompete. Therefore, the trial court did not err by finding that Ardagh may enforce the Noncompete.

## 2. Noncompete Requirements

[31] Vickery argues that even if Ardagh has the right to enforce the Noncompete, the Noncompete itself fails to comply with the requirements for such an agreement:

> Restrictive covenants are not favored in Pennsylvania, but have long been held to be enforceable if: (1) they are incident to an employment relationship between the parties; (2) they are supported by adequate consideration; (3) the restrictions imposed by the covenant are reasonably necessary for the protection of legitimate interests of the employer; and (4) the restrictions imposed are reasonably limited in duration and geographic extent.

*Pulse Techs., Inc. v. Notaro*, 67 A.3d 778, 784 (Pa. 2013). Vickery argues that the Noncompete fails to satisfy each of the three latter requirements.

## a. Consideration

[32] Vickery contends that the Noncompete is unenforceable because it was imposed by SGC after Vickery's employment had already begun, without the provision of additional consideration. He notes that he began his employment on September 8, 2004, but was not asked to sign the Noncompete until September 10. *Pulse Technologies*, however, explicitly holds that

> a restrictive covenant need not appear in an initial employment contract to be valid; rather, it has been long held that, if a restrictive covenant "is an auxiliary part of the taking of employment and not a later attempt to impose additional restrictions on an unsuspecting employee, a contract of employment containing such a covenant is supported by valuable consideration and is thereby enforceable."

[33] 67 A.3d at 784-85 (quoting *Modern Laundry & Dry Cleaning Co. v. Farrer*, 536 A.2d 409, 411 (Pa. Super. 1988)).

[34] Ardagh notes that the trial court observed Vickery's "lack of candor to the Court" regarding his employment timeframe and noted that as a result, it afforded greater weight to Ardagh's testimony on this issue. Prelim. Inj. Order p. 41. Specifically, while Vickery did begin working for SGC on September 8, he began as a temporary employee; it was only on September 10—the day on which he signed the Noncompete—that he became a full-time, permanent

employee. Under these circumstances, the trial court did not err by finding that Vickery's employment was sufficient consideration to support the Noncompete.

## b. Protectable Interests

[35] Vickery argues that Ardagh has failed to identify any protectable interest to justify keeping him from beginning work at Owens-Illinois. In support of this argument, he highlights and discusses some, but not all, of the proprietary or confidential information found by the trial court to constitute a protectable interest. Specifically, Ardagh notes that Vickery omits many of the trial court's findings with respect to Ardagh's protectable interests:

> Vickery does not address the remaining confidential and trade secret information that the trial court discussed. [Prelim. Inj. Order p. 8-9.] (discussing Vickery's work designing mould equipment and replacement moulds, supplying vendors with detailed engineering drawings of Ardagh's moulds, trouble shooting Ardagh's mould designs, and interacting with Ardagh's manufacturing and product design departments); *id.* [at 13-14] (discussing Vickery's role in a rapid prototyping project); *id.* [at 14-15] (discussing Vickery's role in pursuing more business from Customer A, which is a customer of both Ardagh's and Owens-Illinois); *id.* [at 17-18] (discussing Vickery's role in servicing Customer C, which is an Ardagh customer that Owens-Illinois is pursuing); *id.* [at 18-19] (discussing Vickery's role on a team working to reduce the incidents of a glass defect known as "birdswing"); *id.* [at 19-20] (discussing Vickery's role in developing a new product).

Appellee's Br. p. 50-51.

[36] It is apparent that Vickery's arguments on this issue amount to a request that we reweigh the evidence. The trial court considered the evidence and found that, as a senior mould engineer, "Vickery participated in meetings where he learned of new drawings and designs, discussed new business opportunities, discussed which business required further focus to retain, and discussed product lines to be updated." *Id.* at 49 (citing Prelim. Inj. Order p. 22). Vickery was also involved in discussions about Ardagh's best practices in the engineering department, including implementing standards and practices imported from Ardagh's European operations. *See* Prelim. Inj. Order p. 50-51 (finding sixteen categories of information in Vickery's possession that constitute trade secrets).

[37] Additionally, and more generally, the trial court found that "protecting trade secrets and confidential information, and preventing a competitor from profiting from an employee's specialized training and skills" are protectable interests. *Id.* at 43. We agree, and find that the trial court did not err by concluding that Ardagh had established that it had protectable interests at stake.

## c. Geographic Restriction

[38] Vickery argues that the Noncompete has no geographic restriction whatsoever. Instead, the Noncompete is "overwhelmingly and unjustifiably broad . . . ." Appellant's Br. p. 42.

[39] The trial court held that, "[h]aving weighed the evidence presented during the hearing," the Noncompete does contain a geographic scope—North America. Prelim. Inj. Order p. 44. Specifically, the trial court found as follows:

> Here, the Noncompete Agreement included the text "Policies and Procedures for North America" in the header and "United States" in the footer. Based on the inclusion of this language, coupled with the fact that Vickery worked in Muncie, Indiana, which would fall within the United States and North America, it is reasonable to assume that the parties were not careless in including "United States" and "North America" in the agreement. Thus, the Court finds that the Noncompete Agreement is limited to Ardagh's North American division, which includes the United States but does not include Canada or Mexico.

*Id.* We find the evidence sufficient to support the trial court's conclusion that the Noncompete is limited in geographic scope to North America. Vickery's arguments to the contrary amount to a request that we reweigh the evidence, which we decline to do.

[40] Courts applying Pennsylvania law have readily enforced nationwide—and even global—restrictive covenants where, as here, the former employer's business was itself nationwide or global. *E.g.*, *Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 476-77 (E.D. Pa. 2007) (applying Pennsylvania law and noting that "the notion of a too-broad geographic scope has become 'antiquated' in light of the increasingly global economy"); *Voluntary Firemen's Ins. Servs., Inc. v. CIGNA Prop. & Cas. Ins. Agency*, 693 A.2d 1330, 1338 (Pa. Super. Ct. 1997) (enforcing nationwide noncompete). In this case, Ardagh has fifteen manufacturing plants located throughout the United States and provides goods and services to customers throughout the country. Ardagh competes directly with Owens-Illinois for business from major customers throughout the United States.

Therefore, Vickery's work for Owens-Illinois would involve the same geographic scope as his work for Ardagh. Under these circumstances, the nationwide scope of the Noncompete is reasonable.[5]

[41] In sum, we find that the trial court did not err by concluding that Ardagh has established a likelihood of success on the merits of its breach of contract claim based on the Noncompete.

## C. Likelihood of Success on the Merits: Trade Secrets Act

[42] The trial court also found that Ardagh was entitled to injunctive relief under the Indiana Trade Secrets Act.[6] Vickery contends that Ardagh has not showed a reasonable likelihood of success on the merits of this claim.

[43] Indiana Code section 24-2-3-3(a) provides that actual or threatened misappropriation of trade secrets may be enjoined. "Trade secret" is defined as follows:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

---

[5] We find a nationwide scope reasonable in this particular case, given the nature of Ardagh's business and the limited number of competitors it faces. It may be that in other cases, a national scope would be unreasonable; for example, a nationwide noncompete might be unreasonable for a dentist's office. Each case must be evaluated on its own facts.

[6] Ind. Code ch. 24-2-3.

>     (1)     derives independent economic value, actual or potential,
>             from not being generally known to, and not being readily
>             ascertainable by proper means by, other persons who can
>             obtain economic value from its disclosure or use; and
>
>     (2)     is the subject of efforts that are reasonable under the
>             circumstances to maintain its secrecy.

I.C. § 24-2-3-2. "Misappropriation" includes, in relevant part, the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use[.]" *Id.*

[44]   Initially, we note that at oral argument, counsel for Vickery conceded that Vickery may not share Ardagh's trade secrets. Counsel also noted that multiple Ardagh employees have stated in the record that they do not question Vickery's trustworthiness. According to counsel, the problem is that Ardagh has never identified or described what trade secrets it contends are in Vickery's possession.

[45]   As discussed above, the trial court found sixteen general categories of information that qualify as trade secrets to which Vickery had access. Prelim. Inj. Order p. 50-51. The trial court was reasonable in concluding that these general categories of information may constitute trade secrets.

[46]   As for Ardagh's efforts to maintain the secrecy of this data, the trial court made the following findings: (1) a key fob and passcode is required to enter Ardagh's

corporate offices; (2) its computers and emails are password protected; (3) Ardagh limits access to certain files; and (4) the code of conduct and the Noncompete require employees to protect Ardagh's intellectual property, trade secrets, and confidential information. We decline Vickery's invitation to second-guess the trial court's findings that these steps amount to efforts that are reasonable under the circumstances to maintain the secrecy of Ardagh's information.

[47] Vickery also argues that there is no evidence of actual or threatened misappropriation of this data. The trial court found that Vickery's future employment with Owens-Illinois "threatens misappropriation of Ardagh's trade secrets because it risks disclosure or use of Ardagh's trade secrets, which Vickery acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Prelim. Inj. Order p. 53. While it may be that Vickery had no intent to misappropriate any trade secrets, we cannot say that the trial court's conclusion that his employment with Owens-Illinois bore a risk of disclosure of those trade secrets was erroneous.

[48] We note, again, that Vickery is amenable to an agreement not to disclose any trade secrets in his possession. But if this case proceeds to a permanent injunction, Ardagh and the trial court will have to set forth in specific detail what, precisely, Vickery is restrained from disclosing. General categories of information will not suffice—there must be clear, explicit guidelines included in any permanent injunction.

## D. Adequacies of Remedy at Law/Irreparable Harm

Vickery directs our attention to well-settled authority that if an award of post-trial damages is sufficient to make the movant whole for its economic injury, then a preliminary injunction is not warranted. *Daugherty v. Allen*, 729 N.E.2d 228, 234 (Ind. Ct. App. 2000). Vickery argues that because Ardagh represented to the trial court that its injuries are strictly economic and its damages are calculable, it has an adequate remedy at law.

At the outset, we note that a breach of a covenant not to compete is prima facie evidence of irreparable harm justifying injunctive relief. *E.g.*, *Central Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 732-33 (Ind. 2008). Additionally, it is undisputed that Vickery would be unable to satisfy a multi-million-dollar judgment; consequently, the trial court did not err by concluding that Ardagh has no adequate remedy at law. *See Jay Cty. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n*, 692 N.E.2d 906, 909 (Ind. Ct. App. 1998) (holding that a "judgment for damages . . . is rendered meaningless when the collection of damages by the injured party is impossible, uncertain, or unusually difficult").

## E. Threatened Injury to Ardagh v. Threatened Injury to Vickery

Vickery argues that Ardagh has identified no more than a marginal interest, and no significant business secrets, that are at risk if Vickery goes to work for Owens-Illinois. Vickery, on the other hand, has been out of work for over a

year, and states that the harm he and his family have suffered is "devastating." Appellant's Br. p. 47.

[52]     Ardagh observes that the trial court found that if an injunction were not issued, Ardagh would be denied the benefit of the Noncompete into which Vickery voluntarily entered as a condition of his employment and that Vickery "would be allowed to work for Ardagh's direct competitor armed with knowledge of Ardagh's confidential and proprietary information and trade secrets as well as Ardagh's strategic plan for growing its business." Prelim. Inj. Order p. 56.

[53]     As for the harm to Vickery, the trial court found that much of it was self-imposed. He freely entered into the Noncompete, he was aware Ardagh might enforce it, he took steps to hide his employment with Owens-Illinois from Ardagh, and he has made no efforts to find other employment. Moreover, while Vickery initially testified that he was "completely cut off from all income" after the TRO was entered, he later told the court that "he had actually been placed on paid leave" by Owens-Illinois. *Id.* at 32 n.2. The trial court noted that it could not "ignore Vickery's lack of candor to the Court in regards to his 'paid leave' status with [Owens-Illinois] when weighing the credibility of Vickery's testimony on other matters." *Id.*

[54]     Further undercutting Vickery's claimed harms is the fact that he has not pursued his case expeditiously. He repeatedly sought continuances in the trial court, asked the trial court to delay ruling on the preliminary injunction, took all thirty days available to him to file his notice of appeal, did not seek to

expedite the preparation of the record or the transcript, and obtained multiple extensions of time from this Court to file his appellant's brief. Indeed, Ardagh emphasizes that Vickery waited so long "that the remedy he focuses his brief on—vacating the injunction against working for Owens-Illinois—is now moot because that provision of the Noncompete and the related injunction provision expires the day the appellee's brief is due." Appellee's Br. p. 60.

[55] Under these circumstances, we find that the trial court did not err in weighing the potential harm to Vickery against the potential harm to Ardagh.

## F. Public Interest

[56] Finally, Vickery argues that the Noncompete is against the public interest because it further consolidates a non-competitive, $5 billion industry "by increasing one of the barriers to entry—the availability of skilled labor." Appellant's Br. p. 47. Additionally, Vickery contends that enforcement of the Noncompete would intimidate other Ardagh employees who may be considering leaving the company.

[57] The trial court disagreed, first noting the strong public interest in enforcing contracts that represent the freely bargained-for interests of the contracting parties. Prelim. Inj. Order p. 58. It further found that enforcement of the Noncompete would not disserve the public interest in allowing parties to an employment contract to freely terminate employment with or without cause:

> a.  First, whether the Court decides to issue a preliminary injunction enforcing Vickery's Noncompete Agreement

against him has nothing to do with other Ardagh employees' decisions to terminate their employment with the company.

b.   Second, even with a noncompete agreement, employees are still free to terminate employment-at-will; they would just need to make sure that their subsequent employment complies with the terms of the noncompete agreement, if any, that the employee signed with the company.

*Id.* at 58-59. Finally, the trial court noted that the enactment of the Indiana Trade Secrets Act shows a public interest in protecting trade secrets from misappropriation. We find no error in the trial court's analysis, and decline to reverse on this basis.

# Conclusion

[58]   In sum, we find that, while the notice procedure in the underlying TRO was insufficient, Vickery has waived the right to make the argument on appeal. We also find that the trial court did not err when it concluded that (1) Ardagh has the right to enforce the Noncompete; (2) Ardagh has established a reasonable likelihood of success on the merits of its breach of contract claim based on the Noncompete; (3) Ardagh has established a reasonable likelihood of success on the merits of its claim under the Indiana Trade Secrets Act; (4) Ardagh has established that its remedies at law are inadequate and it would suffer irreparable harm during the pendency of the action; (5) the threatened harm to Ardagh outweighs the threatened harm to Vickery; and (6) the public interest

would not be disserved by granting the injunction. In short, the trial court did not err by issuing the preliminary injunction.

[59] The judgment of the trial court is affirmed and remanded for further proceedings.

Bailey, J., and Altice, J., concur.