

**FILED**

Feb 02 2024, 8:45 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Thomas F. Bedsole
Maggie L. Smith
Todd D. Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

John P. Higgins
Michael J. Blinn
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Willow Haven on 106th Street, LLC, <br><br> *Appellant-Defendant,* <br><br> v. <br><br> Hari Nagireddy and Saranya Nagireddy, <br><br> *Appellees-Plaintiffs.* | February 2, 2024 <br><br> Court of Appeals Case No. 22A-PL-2931 <br><br> Appeal from the Hamilton Superior Court <br><br> The Honorable Matthew C. Kincaid, Special Judge <br><br> Trial Court Cause No. 29D02-2207-PL-5323 |

**Opinion by Chief Judge Altice**
Judge Foley concurs.
Judge Weissmann dissents with separate opinion.

**Altice, Chief Judge.**

## Case Summary[1]

Hari and Saranya Nagireddy filed a Complaint for Injunctive Relief seeking a declaratory judgment and preliminary and permanent injunctions against Willow Haven on 106th Street, LLC (Willow Haven) to stop Willow Haven from building a residential structure (the Home) to house up to ten elderly persons suffering from Alzheimer's disease or other forms of dementia. The Home, already partially constructed, is located in the City of Carmel (the City) in an area zoned for single-family housing, on a lot next to where the Nagireddys reside. Willow Haven moved to dismiss the Nagireddys' complaint for failure to exhaust administrative remedies, which motion the trial court denied. Following a hearing, the trial court granted the Nagireddys' request for a preliminary injunction against Willow Haven, thereby enjoining Willow Haven from completing construction of the Home. In this interlocutory appeal, Willow Haven presents several issues for review, which we consolidate and restate as:

> 1. Were the Nagireddys required to exhaust administrative remedies before pursuing judicial review?

> 2. Did the trial court err in granting a preliminary injunction in favor of the Nagireddys?

---

[1] We held oral argument in Indianapolis on December 14, 2023. We commend counsel for both parties on the quality of their written and oral advocacy.

We affirm.

## Foundational Legal Principles

"America's growing elderly population has created a tremendous demand for elderly housing and related social services." WILLIAM H. GROGAN, *The Tension Between Local Zoning and the Development of Elderly Housing*, 33 SUFFOLK U. L. REV. 317, 317 (2000). This is especially true for an estimated twenty to forty percent of elderly who suffer from dementia and Alzheimer's. LISA BRODOFF, *Planning for Alzheimer's Disease*, 17 ELDER L.J. 239, 240 (2010). These individuals particularly benefit from living in neighborhood-based, single-family group homes rather than nursing homes or assisted living facilities. Such group homes provide a small, family-like setting that is not only desirable, but also medically beneficial to persons suffering from dementia or Alzheimer's. To that end, there are federal and state laws that protect these individuals in the realm of housing services.

First, there is the Americans with Disabilities Act (ADA), which was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). In the statute itself, Congress noted that "historically, society has tended to isolate and segregate individuals with disabilities" and that such discrimination continues to be "a serious and pervasive social problem" in areas such as housing. 42 U.S.C. § 12101(a)(2), (3). A "primary obstacle" to residential group home living is the "not in my backyard" reactions of neighbors who

oppose group homes. *See Appellant's Brief* at 16 (citing DISABILITIES AND THE LAW § 7:13; GRAHAM, *There Goes the Neighborhood: The Evolution of "Family" in Local Zoning Ordinances*, 9 TOURO L. REV. 699, 722 (1993)).

[5] With the Fair Housing Act (FHA), and as amended in 1988 by the Fair Housing Amendments Act (FHAA), Congress declared its intent to encourage and protect the rights of persons with disabilities to choose to live in neighborhoods that best serve their disabilities. *See* 42 U.S.C. § 3601, *et seq.* Congress enacted the FHA to prohibit housing discrimination against individuals based on race, color, sex, religion, or national origin. 42 U.S.C. § 3601, *et seq.* In 1988, the FHA was amended to expand the right to fair housing to handicapped[2] persons with mental or physical disabilities. The FHAA also defined discrimination as including the "refusal to make *reasonable accommodations* in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(1) and (3)(B) (emphasis supplied).

[6] At the State level, Indiana has faithfully implemented the mandates of the federal statutes for the benefit of the disabled and mentally ill in the realm of housing. The General Assembly declared "void as against the public policy of the state," restrictions or conditions that purport to exclude the use of property

---

[2] "Handicap" is defined as "a physical or mental impairment that substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h).

"as a residential facility for individuals with a developmental disability or individuals with a mental illness" because the facility is a business, is occupied by individuals who are not related, or "for any other reason." Ind. Code § 12-28-4-10(b). The General Assembly also declared that "[a] zoning ordinance . . . may not exclude a residential facility for individuals with a mental illness from a residential area solely because the residential facility is a business or because the individuals residing in the residential facility are not related." I.C. § 12-28-4-7(a). Indiana has also enacted laws particularly for the benefit of elderly suffering from Alzheimer's or other forms of dementia. *See* I.C. 12-10 and I.C. 12-10-5.5. Specifically, Indiana provides different ways to care for elderly with Alzheimer's and dementia disabilities—licensed group homes called "residential facilities for individuals with mental illness" under I.C. § 12-28-4, and, more recently, as discussed below, "housing with services establishments" that are dedicated specifically to providing care to those with Alzheimer's and dementia under Ind. Code § 12-10-5.5. The City incorporated federal and state law mandates into its Unified Development Ordinance (UDO), which is the City's comprehensive zoning ordinance.

## Facts & Procedural History

In December 2020, Willow Haven applied for a permit to build the Home at 2080 West 106th Street,[3] which parcel is located in a district zoned S1, Single

---

[3] This lot is located near the 15th hole of the Crooked Stick Golf Course.

Family Residential, under the UDO.[4] Willow Haven describes the Home as a residential group home for elderly individuals suffering from Alzheimer's or other forms of dementia.[5] The Home is to house up to ten residents with each resident having their own private bedroom and bath and all residents sharing the kitchen, dining, and living space. The Home is to function as a single housekeeping unit and emulate a family setting, with all meals prepared, served, and consumed by the residents together as a family unit and with the residents spending time together, engaging in activities and entertainment. The residents are to have twenty-four-hour assistance that will be provided by two dementia-certified caregivers and an operations manager.

[8] Under Willow Haven's plans, the Home will not provide any medical care or have medical professionals on staff, will not require other licensed caregivers to be on hand, and will have a higher staff-to-resident ratio than a nursing home. Willow Haven holds no licenses from any state or federal agencies and expressly states that it has no intention of obtaining any licenses. On August 16, 2021, the City approved Willow Haven's residential building permit request, and Willow Haven began construction of the Home.

---

[4] Ind. Code § 36-7-4-1109(c) provides that "[i]f a person files a complete application" for a permit, then the application is "governed for at least three (3) years after the person applies for the permit by the statutes, ordinances, rules, development standards, and regulations in effect and applicable to the property when the application is filed." Thus, the version of the UDO effective at that time applies. The parties do not dispute this.

[5] In its marketing materials Willow Haven refers to the Home as a "premier boutique memory care home." *Appellant's Appendix Vol. 2* at 234.

[9] The Nagireddys' home is located directly adjacent to the lot on which the Home is being built. On May 23, 2022, the Nagireddys contacted the City and requested information pertaining to issuance of the building permit to Willow Haven. The City provided the requested information the same day. On June 21, 2022, the Nagireddys, by counsel, wrote to the City and expressed their belief that construction of the Home with its intended use as an "unlicensed assisted living facility" violated the UDO. *Appellant's Appendix Vol. 2* at 76. The Nagireddys did not claim that the physical structure of the home violated the UDO;[6] rather, the Nagireddys claimed that the intended use required Willow Haven to obtain a variance from the Carmel Board of Zoning Appeals (BZA), which it did not do. They demanded that the City issue an order to stop construction of the Home.

[10] The City refused to issue a stop-work order, explaining to the Nagireddys that Mike Hollibaugh, the Director of the Department of Community Services (the Director), had previously made a determination for a separate, but nearly identical proposed construction project[7] that elderly individuals with Alzheimer's or dementia are a protected class and "therefore eligible to reside in a Group Home without first obtaining a variance." *Id*. at 80. The City found the Director's determination to be consistent with the UDO's definition of

---

[6] There is no dispute that the physical structure of the Home complies with the UDO.

[7] The other proposed construction project for which the Director had made a determination as to compliance with the UDO was for a group home for ten frail elderly individuals with Alzheimer's or dementia.

single-family dwelling, I.C. Chap. 12-28-4, the FHA, the ADA, and 7th Circuit case law.

[11] Consistent with the Director's previous determination, the City, through its attorney, informed the Nagireddys that the UDO's definitions for group home and family "could not preclude Willow Haven from constructing a home for frail elderly individuals with dementia and/or Alzheimer's" as such preclusion "may have violated both state and federal law." *Id*. The City stood by the Director's determination that no variance was required prior to issuing a building permit to Willow Haven.

[12] On July 19, 2022, the Nagireddys filed with the trial court a complaint for declaratory and injunctive relief against Willow Haven, the City, and several entities associated with the City. The Nagireddys maintain that only licensed group homes are permitted under the UDO and thus, because the Home is not licensed, it violates the UDO. All defendants moved to dismiss the Nagireddys' complaint for failure to exhaust administrative remedies. The Nagireddys then voluntarily dismissed the City and all other defendants associated with the City but continued to pursue the action against Willow Haven. Following a hearing, the trial court denied Willow Haven's motion to dismiss.

[13] A preliminary injunction hearing was held November 1, 2022. By agreement, both parties tendered pre-hearing briefs and documentary evidence in support of their respective positions. There were no witnesses or live testimony at the November 1 hearing; only legal arguments were presented to the court.

Thereafter, both parties tendered findings of fact and conclusions of law. On November 9, 2022, the trial court signed the Nagireddys' proposed findings and conclusions, adopting them verbatim,[8] and thereby enjoined Willow Haven from proceeding with construction of the Home. In so doing, the trial court preliminarily resolved in the Nagireddys' favor disputes concerning (1) whether the Nagireddys were required to exhaust administrative remedies prior to pursuing judicial review, and (2) whether the Home qualified as a "group home" and could therefore be considered a single-family home under the applicable zoning ordinance. Willow Haven filed the instant interlocutory appeal.

## Discussion & Decision

### 1. Exhaustion of Administrative Remedies

[14] Generally, if an administrative remedy is available, it must be pursued before the claimant is allowed access to the courts. *T.W. Thom Const., Inc. v. City of Jeffersonville*, 721 N.E.2d 319, 322 (Ind. Ct. App. 1999). The failure to exhaust administrative remedies deprives the trial court of subject matter jurisdiction. Subject matter jurisdiction cannot be waived. *Id*. Willow Haven argues that the Nagireddys were not entitled to a preliminary injunction because they failed

---

[8] We have stated before that "the practice of accepting verbatim a party's proposed findings weakens our confidence as an appellate court that the findings are the result of considered judgment by the trial court." *Moeder v. Salin Bank & Trust Co.*, 27 N.E.3d 1089, 1098 (Ind. Ct. App. 2015). Nevertheless, we also recognize that "it is not uncommon or per se improper for a trial court to enter findings that are verbatim reproductions of submissions by the prevailing party." *Id*.

to timely pursue administrative means to challenge the issuance of the building permit.

[15] The exclusive means for judicial review of zoning decisions "made by a board of zoning appeals, legislative body, plan commission, preservation commission, or zoning administrator" is set out in I.C. § 36-7-4-1600, -1601. One of the requirements that must be met prior to initiating judicial review of a zoning decision is that the individual(s) seeking judicial review have exhausted all administrative remedies "within the board whose zoning decision is being challenged." I.C. § 36-7-4-1604(a). If the person fails to object to a zoning decision or timely petition for review of a zoning decision, the person waives their right to judicial review. I.C. § 36-7-4-1604(b). Willow Haven maintains that the Nagireddys failed to timely file a petition for review[9] with the BZA and thus, they waived judicial review of the City's issuance of the building permit to Willow Haven for the Home.

[16] The Nagireddys assert that they had no notice of the issuance of the permit and thus no opportunity to appeal to the BZA within statutory time constraints or constraints set out in the UDO. Under such circumstances, they argue that they were not required to exhaust administrative remedies and can properly pursue

---

[9] "A petition for review is timely only if the petition for review is filed not later than thirty (30) days after the date of the zoning decision that is the subject of the petition for judicial review." I.C. § 36-7-4-1605. This thirty-day period does not, as Willow Haven suggests, run from the day the Nagireddys learned that the building permit had been issued. The statute clearly states that a petition for review must be filed within thirty days of the zoning decision being reviewed.

injunctive relief with the court.  In support of their argument, they direct us to *Bixler v. LaGrange County Bldg. Dept.*, 730 N.E.2d 818, 820 (Ind. Ct. App. 2000).

[17]     In *Bixler*, the LaGrange County Building Department granted an improvement location permit to landowners to place a manufactured home on their lot.  The Bixlers, owners of an adjoining lot, filed a complaint with the trial court to obtain a temporary restraining order and a permanent injunction preventing the placement of the manufactured home arguing that it could only be located in a mobile home park under applicable zoning classifications.  The trial court dismissed the Bixlers' complaint finding that they had failed to exhaust their administrative remedies.

[18]     On appeal, the *Bixler* court stated "with regard to the issuance of building permits, the exhaustion prerequisite historically has been restricted only to permit applicants, who are *directly affected* by a public official's decision to issue, condition or deny building permits."  730 N.E.2d at 820 (emphasis added).  The *Bixler* court noted that this rule was established long ago in *Fidelity Trust Co. v. Downing*, 68 N.E.2d 789 (Ind. 1946), wherein the *Fidelity* court rejected an argument that the party seeking to enjoin erection of a building on grounds that its construction violated local zoning provisions had to first exhaust administrative remedies.  As the *Fidelity* Court explained, because the objecting parties were not parties to the building permit and thus, not directly affected, they could not be required to exhaust administrative remedies.  The Court's rationale was that "[t]o hold otherwise would be to hold that every property owner in any particular district would be compelled to take notice of every

action" of an administrative official or board charged with enforcement of the ordinance. 68 N.E.2d at 791; *see also Laws v. Lee*, 471 N.E.2d 1229, 1234 (Ind. Ct. App. 1984) (following *Fidelity* and holding that neighboring property owners were not responsible for monitoring the issuance of improvement location permits for which they had not applied and thus, they were not required to exhaust administrative remedies prior to challenging the issuance of such with the courts). The *Bixler* court followed the precedent set in *Fidelity* (and *Laws*) and held that because the law did not hold the Bixlers responsible for monitoring the issuance of building permits for which they did not apply, they were not required to exhaust administrative remedies prior to seeking injunctive relief from the trial court.[10]

[19] The Nagireddys are in the same position as the Bixlers (and the complainants in *Fidelity* and *Laws*). They are adjoining landowners who are not responsible for monitoring the issuance of building permits for which they have not applied. Here, they had no notice of the issuance of the building permit until after it was too late to appeal such issuance to the BZA. Under these circumstances, the Nagireddys were not required to exhaust administrative remedies with the BZA before pursuing declaratory and injunctive relief with the trial court.

---

[10] The *Bixler* court did note that if a person has knowledge of the issuance of a permit, they *may* initiate an appeal to the zoning board, but are not required to do so. 730 N.E.2d at 821 (citing *Stout v. Mercer*, 312 N.E.2d 515, 519 (Ind. Ct. App. 1974)) (emphasis supplied).

## 2. Preliminary Injunction

An injunction is an extraordinary remedy that should be granted only with caution. *Rennaker v. Gleason*, 913 N.E.2d 723, 733 (Ind. Ct. App. 2009). "The grant or denial of a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was a clear abuse of that discretion." *Duke Energy of Ind., LLC v. City of Franklin*, 69 N.E.3d 471, 481-82 (Ind. Ct. App. 2016). When granting a preliminary injunction, a trial court is required to enter special findings and conclusions thereon. Ind. Trial Rules 52, 65(D). When considering whether a trial court's grant of a preliminary injunction constitutes an abuse of discretion, this court determines whether the evidence supports the trial court's special findings of fact and whether the findings support the judgment. *Hannum Wagle & Cline Eng'g, Inc. v. Am. Consulting, Inc.*, 64 N.E.3d 863, 874 (Ind. Ct. App. 2016). An abuse of discretion can occur under various circumstances, including when the trial court misinterprets the law. *See Myers v. Myers*, 560 N.E.2d 39, 42 (Ind. 1990). We will reverse the trial court's judgment only when it is clearly erroneous, and a judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Hannum*, 64 N.E.3d at 874.

To obtain a preliminary injunction, the moving party has the burden of showing by a preponderance of the evidence that: (1) the movant's remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) the movant has at least a reasonable likelihood of success at trial by establishing a prima facie case; (3) threatened injury to the movant outweighs

the potential harm to the nonmoving party resulting from the granting of an injunction; and (4) the public interest would not be disserved by the granting of the injunction. *Apple Glen Crossing, LLC v. Trademark Retail, Inc.*, 784 N.E.2d 484, 487 (Ind. 2003). "Failure to prove any one of these requires denying the injunction." *Leone v. Commissioner, Ind. Bureau of Motor Vehicles*, 933 N.E.2d 1244, 1248 (Ind. 2010).

[22] Willow Haven's primary challenge to the trial court's issuance of the preliminary injunction is the court's determination that the Nagireddys established that they have a reasonable likelihood of success at trial. As we explain below, we agree with the trial court's assessment of the Nagireddys' claim.

[23] Under the UDO, an S1 zoning district is classified as a residential environment that permits single-family dwellings. *Exhibits Vol. 1* at 41. The UDO defines a "single-family dwelling" as including "a Group Home for the mentally ill" pursuant to I.C. § 12-28-4-7 and "a Group Home for not more than ten (10) developmentally disabled individuals which is established under a program authorized by *IC 12-11-1.1-1(e)(1)* or *IC 12-11-1. l-1(e)(2)*." *Exhibits Vol. 2* at 126 (italics in original). In turn, a "group home" is defined by the UDO as:

> 1. A residential structure (**licensed** under *IC 12-17.4*) in which care is provided on a twenty-four (24) hour basis for not more than ten (10) children; or

2. A facility (**licensed** under *IC 12-28-4*) that provides residential services for developmentally disabled individuals in a program described in *IC 12-11-1.1-1(e)(1)* or *IC 12-11-1.1-1(e)(2)*; or

3. A facility (**licensed** under *IC 12-28-4*) that provides residential services for mentally ill individuals in a program described in *IC 12-22-2-3*.

*Id*. at 130 (italics in original; bolding supplied). "Family" is defined in the UDO as "one or more persons living as a single housekeeping unit." *Id*. at 127.

[24] Clearly, the Home does not fall within the UDO's black-letter definition of group home as it is not a licensed facility of any kind. Seemingly acknowledging such, Willow Haven maintains that the Home is a statutorily authorized housing with services establishment that, although not licensed, qualifies as a group home under the UDO. Effective July 1, 2021,[11] the legislature created the housing with services establishment within the statutory scheme specifically directed at individuals in need of Alzheimer's and dementia special care. To qualify as a housing with services establishment, the home must:

1. provide "sleeping accommodations to at least five (5) residents;" and

---

[11] This is after Willow Haven applied for its building permit but before the City issued the permit for construction of the Home.

2. offer or provide

> a. "at least one (1) regularly scheduled health related service" defined as "home health services . . ., attendant and personal care services, professional nursing services, and the central storage and distribution of medications"; or

> b. "at least two (2) regularly scheduled supportive services," defined as "help with personal laundry, handling or assisting with personal funds of the residents, or arranging for medical services, health related services, or social services"

"whether offered or provided directly by the establishment or by another person arranged for by the establishment."

I.C. § 12-10-5.5-2.5; I.C. § 12-10-15-3(a), -2, -6. There is no registration or licensing requirement for a housing with services establishment.[12] Willow Haven maintains that a housing with services establishment is merely an unlicensed group home and that the City properly followed the Director's determination that the Home qualified as a group home under the UDO.

[25] The Nagireddys argue that because the Home does not fit within the UDO's definition of group home, Willow Haven was required to obtain a variance. Under the UDO, a variance is "[a] modification of the specific requirements of

---

[12] The statute creating the housing with services establishment expressly provides that such is not "[a] group home licensed under IC 31-27 or IC 12-28-4." I.C. § 12-10-15-3(b)(3).

the [UDO] granted by the [BZA] in accordance with the terms of the [UDO]." *Exhibits Vol. 2* at 146. In other words, a variance is used where modification from the literal enforcement of the provisions of the UDO is sought. Pursuant to Section 9.15 of the UDO, an applicant must submit a variance application to the Director, who is charged with "review[ing] the materials solely for the purpose of determining whether the application is complete, is in technical compliance with all applicable ordinances, laws and regulations." *Id.* at 109. The Director then forwards the variance request to the BZA, and the variance application is placed on the BZA's agenda for notice and a public hearing in accordance with the BZA's procedural rules. In this regard, we agree with the Nagireddys that the Director's role in the context of the variance process is administrative, not substantive. The Director does not have the authority to issue a variance decision or otherwise permit any sort of departure from the UDO.

[26] Despite the fact that the Home does not fall within the UDO's definition of group home, Willow Haven did not seek a variance for its proposed use of the Home. In approving Willow Haven's building permit, the City stood behind the Director's determination that the Home could be built in an S1 district without a variance. In this vein, the Director essentially made a unilateral variance determination contrary to the authority granted him. A variance determination is solely within the province of the BZA and such determination is made by the BZA through procedures that require notice and a public hearing. Even assuming the Home is a statutorily authorized housing with

services establishment, whether such is a permitted use in an S1 district or the result of a reasonable accommodation under federal law is a matter to be addressed and decided by the BZA. The Director's determination in this regard is not binding. In short, the Nagireddys have established a prima facie case that the Home is not a permitted use under the UDO as it is not a licensed group home. Whether federal and state law mandate that a variance be granted, or a reasonable accommodation be made, is a matter to be determined by the BZA.

[27] Turning now to the remaining elements of a preliminary injunction, with respect to the first element, Willow Haven argues that the Nagireddys did not show that they will suffer irreparable harm because their claimed loss of value to their property is purely financial and therefore, insufficient to warrant equitable relief. *See PrimeCare Home Health v. Angels of Mercy Home Health Care, LLC*, 824, 376, 383 (Ind. Ct. App. 2005) (noting that "[l]oss incurred that is essentially financial is usually insufficient to warrant the grant of equitable relief). Willow Haven also argues that the balance of harm tips in favor of the elderly who suffer from Alzheimer's or dementia as they will be denied their right to live in a residential area.

[28] In finding in favor of the Nagireddys, the trial court determined that they were not required to establish irreparable harm or that the balance of harms was in their favor because Willow Haven's intended use for the Home violates the UDO and is therefore unlawful. *See L.E. Servs., Inc. v. State Lottery Comm'n of Ind.*, 646 N.E.2d 334, 349 (Ind. Ct. App. 1995) (noting that because the sale of out-of-state lottery tickets violated the State constitution and statutes and was

therefore unlawful, the plaintiff was not required to make a showing of irreparable harm or a balance of the hardship in his favor). The trial court's conclusion in this regard is not erroneous.

[29] Finally, Willow Haven argues that the public interest will be disserved by the issuance of an injunction because elderly who suffer from Alzheimer's or dementia will be denied their right to live in a residential area. The Nagireddys maintain that this is not a "not in my back yard" situation. They do not dispute that public policy and the UDO permit certain licensed group homes for individuals with mental illness to be constructed in an S1 zoning district; they simply contend that the unlicensed group home that Willow Haven intends to operate is not one of them. The trial court concluded that enforcing the UDO as it is written and enjoining further construction of the Home serves the public interest. We agree. The UDO states that an impermissible use is a public nuisance. Willow Haven's intended use for the Home is not a permitted use under the express language of the UDO. Under the circumstances presented, imposition of a preliminary injunction best serves the public interest.

[30] In summary, the Nagireddys were not required to exhaust administrative remedies before pursuing injunctive relief with the trial court, and the trial court did not abuse its discretion in entering a preliminary injunction in favor of the Nagireddys, thereby enjoining Willow Haven from completing construction of the Home.

[31] Judgment affirmed.

Foley, J., concurs.

Weissmann, J., dissents with separate opinion.

**Weissmann, Judge, dissenting.**

[32] I agree with the City of Carmel (Carmel) that Willow Haven's establishment could be built in a residential zone without a variance. In my view, the majority's contrary conclusion has two flaws:

> 1. Because Carmel adopted its UDO three years before the legislature added this category of group homes, it is of no moment that the UDO fails to reference them.

> 2. The majority's definition of group home risks illogical application by allowing residential zoning for licensed group homes but requiring variances for unlicensed group homes which closely emulate traditional family environments.

### *The UDO Predates Adoption of Housing with Services Establishments*

[33] The UDO's failure to include housing with services establishments for Alzheimer's and dementia special care within its definition of group homes does not mean they are excluded. Rather, the group home definition section of the UDO is merely a reflection of the law in effect in 2018 when the UDO was adopted.[13] The UDO incorporated three general categories of group homes in existence at that time: (1) homes for children; (2) homes for people with

---

[13] The UDO was adopted on October 16, 2017, and became effective on January 1, 2018. UDO § 1.32.

developmental disabilities; and (3) homes for people experiencing mental illness. Exhs. Vol. II, p. 130.

[34] A few years after the UDO definition took effect, the legislature added another category of group homes for residents who need Alzheimer's and dementia special care. Ind. Code §§ 12-10-5.5-1, -2.5, -3, -4, -5 (as amended by 2021 Ind. Legis. Serv. P.L. 48-2021, effective July 1, 2021).[14] This new type of group home does not need the license required of the other three types of group homes noted in the UDO's group home definition but is still subject to State regulation. *See, e.g.,* Ind. Code § 12-10-5.5 *et seq.*

[35] Because the UDO is an intrinsically evolving document, it allowed for these types of changes in the law without requiring an ordinance revision. For instance, to ensure its continual compliance with state law, the UDO automatically incorporates statutory changes. UDO § 1.15 ("Whenever Indiana Code (sic) cited in the Unified Development Ordinance has been amended or superseded, the Unified Development Ordinance shall be deemed amended in reference to the new or revised code."). The evolving nature of the UDO is also reflected in its express acknowledgment that it must give way to higher

---

[14] The legislature does not include Alzheimer's Disease or dementia within its definition of mental illness in Title 12. *See*, e.g., Ind. Code §§ 12-7-2-130, -117.6 (defining mental illness as "psychiatric disorder"). This is presumably because medical experts largely agree Alzheimer's Disease, which is the most common cause of dementia, is more properly classified as a progressive neurodegenerative disease or a brain disorder. *See generally Alzheimer's Disease*, Mayo Clinic (Aug. 30, 2023), https://www.mayoclinic.org/diseases-conditions/alzheimers-disease/symptoms-causes/syc-20350447.

standards imposed by state and federal law. UDO § 1.09(B)(2)(b) ("Whenever a provision of any State or federal code or regulation or other City ordinance or regulation imposes a greater restriction or a higher standard than is required by the [UDO], the provision of the State or federal code or regulation or other City ordinance or regulation shall apply.")

[36] Here, Carmel reviewed Willow Haven's application within the overall framework of the UDO, as influenced by the Fair Housing Act, the ADA, and Indiana's laws as supplemented by the legislation creating new group homes for Alzheimer's and dementia care. Carmel concluded that the UDO treated all group homes for persons with disabilities in the same way the UDO treated single-family dwellings. App. Vol. II, pp. 81-82. Indeed, Willow Haven is the second housing with services group home permitted as part of Carmel's S1 zoning. App. Vol. II, pp. 81- 85. Given all these factors, I would find Carmel properly included Willow Haven within residential zoning absent a variance.

### *Reliance Only on the UDO's Definition Section Risks Illogical Results*

[37] Interpretation of ordinances is a question of law that we review de novo and to which we apply the rules of statutory construction. *Noblesville, Ind., Bd. of Zoning Appeals v. FMG Indianapolis, LLC*, 217 N.E.3d 510, 513-14 (Ind. 2023). As always, the first step is to determine whether an ambiguity exists. *Id.* By now, it is evident that the majority and I read the UDO differently. Thus, the UDO is "open to judicial construction." *Anderson v. Gaudin,* 42 N.E.3d 82, 85 (Ind.

2015). Crucial here is the desire to avoid interpretations that "bring about an unjust or absurd result." *Id.* I fear the majority's decision does precisely that.

[38] Interpreting the UDO's group home definition to exclude *unlicensed* housing with services establishments for Alzheimer's and dementia special care—when it already allows for *licensed* establishments—is illogical. As planned, Willow Haven's group home will have two dementia-certified caretakers on site at all times to help residents with their daily activities. Each resident will have their own bedroom and bathroom but share a common living room and kitchen. Groceries will be provided, and a chef will cook the meals, which will be shared family-style. Residents will participate in housekeeping chores as their conditions allow.

[39] In sum, although Willow Haven's establishment closely resembles a residential family home, under the majority's interpretation of the UDO, Willow Haven must obtain a variance. A licensed group home for persons with developmental disabilities at the same site would not. This disparity is illogical, and I cannot conclude that the UDO intended this result.

[40] Carmel interpreted its UDO to allow Willow Haven's construction within its S1 zoning. Because this interpretation is correct, I would reverse and remand for the trial court to vacate the preliminary injunction.